*In re* MARTIN (MARTIN v MARTIN)

Docket Nos. 99699, 99700. Argued March 7, 1995 (Calendar No. 10). Decided August 22, 1995.

Mary Martin, as guardian and conservator of Michael Martin, her husband, a legally incapacitated person, petitioned the Allegan County Probate Court to be permitted to withdraw life-sustaining treatment in the form of a gastrostomy tube. Leeta Martin and Patricia Major, Michael's mother and sister, opposed the petition and sought removal of Mary Martin as conservator. The court, George A. Greig, J., denied both petitions. The Court of Appeals, WAHLS, P.J., and SHEPHERD and CAVANAGH, JJ., remanded the case for more specific findings regarding Michael's physical, sensory, emotional, and cognitive functioning (Docket Nos. 161299, 161431). Thereafter, the probate court determined that there was clear and convincing evidence that before his injuries Michael expressed a medical preference to decline life-sustaining medical treatment under the circumstances presented. After remand, the Court of Appeals affirmed, holding that the trial court's determination was not clearly erroneous. The respondents appeal.

In an opinion by Justice MALLETT, joined by Chief Justice BRICKLEY, and Justices CAVANAGH, BOYLE, RILEY, and WEAVER, the Supreme Court *held:*

Once it is determined that a person is conscious and was competent at some time before becoming incapacitated, a court may not authorize a surrogate decisionmaker to waive the person's right to continue life-sustaining medical treatment *unless it is established by clear and convincing evidence that the person, while competent, stated a desire to refuse life-sustaining medical treatment under the specific circumstances present.*

1. The common-law doctrine of informed consent allows a person to refuse life-sustaining treatment. The right to refuse medical treatment under the particular circumstances, made while competent, refers to decisions already made and communicated by the patient before losing the capacity to make further choices. It survives incompetency and may be discharged by a surrogate decisionmaker. In determining whether the surrogate may effectuate the incompetent patient's deci-

sion, the question is not what a reasonable or average person would have chosen to do under the circumstances, but what the particular patient would have done if able to choose. The patient's statements, made while competent, must illustrate a firm and settled commitment to the termination of life support under the circumstances. Any objective analysis is not encompassed within the right of informed consent.

2. A specific patient's statements, made while competent, must meet the exacting standard of clear and convincing evidence. Optimally, the patient should express through a prior directive such as a living will, patient advocate designation, or durable power of attorney, the situations in which it is preferred that medical intervention cease. While a written directive would provide the most concrete evidence, oral statements, made under the proper circumstances, are not precluded. The amount of weight accorded prior oral statements depends on the remoteness, consistency, specificity, and solemnity of the prior statement. Only when the patient's prior statements clearly illustrate a serious, well thought out, consistent decision to refuse treatment under these exact circumstances, or circumstances highly similar to the current situation, should treatment be refused or withdrawn.

3. In this case, virtually all the witnesses agreed that Michael Martin was not in a vegetative state and was not suffering from the type of incapacitation referred to in his prior expression of the desire not to continue life-sustaining medical treatment. His wife's uncorroborated affidavit and trial testimony do not constitute clear and convincing evidence of his preinjury desire to refuse treatment. Co-workers testified that his present condition is not the type referred to in conversations with them. In the absence of clear and convincing evidence of his decision to refuse life-sustaining medical treatment under the present circumstances, its removal cannot be authorized.

Reversed.

Justice LEVIN, dissenting, stated that the trial court did not clearly err in finding that clear and convincing evidence was presented that Michael Martin, before his injury, did not want to be kept alive in his current condition; thus, it is unnecessary to reach the question what showing, other than clear and convincing evidence, would justify withdrawal of life-sustaining medical treatment.

The probative value of a once-competent patient's past statements about life-sustaining medical treatment varies, depending on their remoteness, consistency, and thoughtfulness, as

well as their specificity and the maturity of the person making the statement. An appellate court may only reverse a trial court's findings of fact if they are clearly erroneous. The evidence adduced at trial demonstrated Michael's deeply felt, consistent, and long-term desire not to be maintained artificially in a helpless condition.

The majority insists under the facts of the case, that life-sustaining medical treatment only may be removed upon clear and convincing evidence of the patient's expressed preinjury wishes, and that a person's wishes are not clearly known unless the applicable medical conditions are accurately specified. In effect, this requirement will force most persons to seek legal assistance to assure that their wishes will be effectuated. To require a highly formal oral or written statement concerning the patient's specific medical condition is unrealistic.

205 Mich App 96; 517 NW2d 749 (1994) reversed.

*Irving M. Stahl,* guardian ad litem, for Michael Martin.

*Vlcko, Lane, Payne & Broder, P.C.* (by *Andrew J. Broder, Lynn Stevens Naoum,* and *Thomas F. Naughton),* for Mary Martin.

*Hess & Hess, P.C.* (by *John H. Hess* and *Daniel B. Hess),* for Patricia Major and Leeta Martin.

Amici Curiae:

*Ann E. Fade,* and *Anna Moretti Kavolius; Foster, Swift, Collins & Smith,* of counsel (by *Brian A. Kaser)* for Choice In Dying.

*Honigman, Miller, Schwartz & Cohn* (by *Michael A. Gruskin* and *Lee W. Brooks)* for Michigan Health and Hospital Association.

*Stewart R. Hakola, Calvin A. Luker,* and *Lisa K. Gigliotti,* for Michigan Protection and Advocacy Service, American Disabled for Assistant Programs Today, Association for Community

Advocacy, ARC Michigan, Autism Society of Michigan, Disability Network, Disability Rights Bar Association, and United Cerebral Palsy of Michigan.

*James W. Kraayeveld, James Bopp, Jr., Thomas J. Marzen, Daniel Avila, John Altomare,* and *Jane E. T. Brockmann,* for National Legal Center for the Medically Dependent and Disabled, Inc.

*Kerr, Russell & Weber* (by *Richard D. Weber* and *Joanne Geha Swanson*) for Michigan State Medical Society.

MALLETT, J. We granted leave in this case to consider whether life-sustaining treatment in the form of a gastrostomy tube that provides nutritive support should be removed from a conscious patient who is not terminally ill or in a persistent vegetative state, but who suffers from a mixture of cognitive function and communication impairments that make it impossible to evaluate. the extent of his cognitive deficits.[1]

The trial court determined that there was clear and convincing evidence that, before his injuries, Michael Martin "expressed [a medical] preference to decline life-sustaining medical treatment under the circumstances presented . . . ."[2] The Court of Appeals affirmed the trial court's determination.[3]

After painstaking review of the facts of this case, we reverse the Court of Appeals decision because we conclude that there is not clear and convincing proof that Michael made a firm and deliberative decision, while competent, to decline medical treatment in these circumstances.

[1] 447 Mich 980 (1994).

[2] 205 Mich App 96, 98-99; 517 NW2d 749 (1994).

[3] *Id.* at 112.

As we begin our analysis, we are mindful that the paramount goal of our decision is to honor, respect, and fulfill the decisions of the patient, regardless of whether the patient is currently competent. The decision to accept or reject life-sustaining treatment has no equal. We enter this arena humbly acknowledging that neither law, medicine nor philosophy can provide a wholly satisfactory answer to this question.

To err either way has incalculable ramifications. To end the life of a patient who still derives meaning and enjoyment from life or to condemn persons to lives from which they cry out for release is nothing short of barbaric. If we are to err, however, we must err in preserving life.

I

A

The Court of Appeals opinion presents an accurate and thorough summary of the facts:

Petitioner and Michael Martin were married in 1972 and thereafter had three children. On January 16, 1987, Michael sustained debilitating injuries in an automobile accident, with the most serious being a closed head injury affecting the bilateral hemisphere of his brain. The injuries significantly impaired his physical and cognitive abilities, left him unable to walk or talk, and rendered him dependent on a colostomy for defecation and a gastrostomy tube for nutrition. Petitioner was appointed Michael's legal guardian and conservator. Michael resided at different nursing homes for the first few years after the accident until July 1990, when he was transferred to the New Medico Neurological Center (NMNC) in Howell, Michigan, where he was still residing at the time of the hearing.

On January 9, 1992, while Michael was being

treated at Butterworth Hospital for an obstructed bowel, petitioner contacted the hospital's bioethics committee for the purpose of determining whether Michael's life-sustaining medical treatment should be withdrawn. On January 15, 1992, after consulting with petitioner, a family friend, a social worker, Michael's treating physician, and nurses at Butterworth Hospital, the committee issued a report stating that withdrawal of Michael's nutritive support was both medically and ethically appropriate, but that court authorization would be required before the hospital would assist in the procedure. None of the personnel at the NMNC and no other members of Michael's family were consulted or notified by the committee.

On March 19, 1992, petitioner filed a petition in the probate court, requesting authorization to withdraw Michael's nutritive support. Respondents Leeta Martin and Patricia Major, who are Michael's mother and sister respectively, opposed the petition and also filed a petition of their own asking that Mary Martin be removed as Michael's guardian and conservator. An evidentiary hearing was held from October 13, 1992, through October 30, 1992, regarding the petition for authority to withdraw Michael's nutritive support.

Petitioner said that Michael was a private but active person before the accident. She claimed that he was always bothered by, and intolerant of, people who were disabled or dependent on others and often stated that he would rather die than be dependent on people and machines. According to petitioner, Michael would not want to be kept alive in his present condition. Two co-workers of Michael each testified that he had remarked to them before the accident that he would not want to continue living in a vegetative state. The remark was made to one of the co-workers during a casual conversation around the lunch table and to the other while discussing someone else who had been severely injured. Both co-workers testified that Michael's present condition is not the type Michael was referring to in the conversations.

before his accident. Respondent Patricia Major admitted that Michael once told her that he would not want to be kept alive by a respirator if he were in a coma.

Conflicting testimony was presented regarding Michael's current level of physical, sensory, emotional, and cognitive functioning. At one extreme, Dr. Joseph Fischhoff, who is head of the Department of Psychiatry at Wayne State University and the chairman of the bioethics committee at Children's Hospital in Detroit, testified that Michael has no voluntary control over any of his limbs, or any ability to function on a voluntary level, and therefore lacks any meaningful interaction with his environment. However, Dr. Robert Kreitsch, who is the director of the Brain Injury Rehabilitation Program at the Mary Free Bed Rehabilitation Center, testified that Michael demonstrated an ability to carry out some voluntary motor commands on his right side, including the ability to pinch and grasp, as well as the ability to recognize faces, respond emotionally, and communicate with others with head nods. According to Dr. Kreitsch, Michael seemed content with his environment and indicated "no" with a head nod when asked whether he has been in any pain or discomfort, and also when asked if there were ever any times when he felt that he did not want to go on living. Other medical experts also presented differing opinions regarding Michael's level of functioning, but generally described it as falling somewhere between that described by Drs. Fischhoff and Kreitsch. All medical experts agreed that Michael was not in a persistent vegetative state or terminally ill.

Petitioner, several therapists from the NMNC, and several lay witnesses all described an apparent limited ability by Michael to interact with others and to respond to simple yes or no questions with head nods; their testimony varied, however, with respect to the consistency and appropriateness of the perceived interaction and responses. The trial judge personally visited and questioned

Michael at the NMNC on October 14, 1992. The judge explained on the record how Michael had moved both his right arm and right leg on command, and how he had responded with appropriate head nods to a series of yes or no questions. Witnesses also testified that there are times when Michael becomes completely withdrawn and does not respond to any stimuli.

In a decision delivered from the bench on October 30, 1992, the trial court ruled that clear and convincing evidence had been presented that Michael did not want to be "kept a dependent person" and that his present condition "falls within what Michael did not want to be." Nonetheless, the court held that Michael's intentions could not be considered because they were not expressed in writing. The trial court further ruled that withdrawal of nutritive support was in Michael's best interests, but that, absent being terminally ill, a best interests standard could not be applied as a matter of law. Accordingly, the trial court denied the petition for authority to withdraw Michael's nutritive support. The trial court then proceeded to also deny respondents' petition for removal of Mary Martin as Michael's guardian and conservator. The court concluded that her "decision-making process" relative to the decision to withdraw life-sustaining medical treatment was not inappropriate. Motions for reconsideration brought by both sides, including a request by respondents for specific factual findings, were thereafter denied. [200 Mich App 703, 706-710; 504 NW2d 917 (1993).]

The Court of Appeals remanded the case "for further and more specific findings of fact and conclusions of law regarding Michael's decision-making capacity . . . [,] present condition or his present level of physical, sensory, emotional, and cognitive functioning." *Id.* at 717-718.

On remand, additional evidence and medical testimony were presented to the trial court. The

Court of Appeals aptly summarized the hearing testimony as follows:

> According to Dr. William Vandenberg, a physical medicine and rehabilitation specialist who works extensively with head-injured patients, Michael can understand only very short and very simple questions and cannot accurately comprehend questions that are lengthy, verbose, or that require the retention of multiple thoughts. Similar testimony was provided by Dr. Donald Rutherford, who is the medical director at the Glenwood Christian Nursing Home where Michael resides. Dr. Robert Kreitsch, who was one of respondents' main experts, likewise described Michael's levels of cognition and comprehension as being limited to "very, very simple terms" and "some simple short phrases." According to Dr. Kreitsch, given Michael's memory deficiencies and inability to retain information, Michael is incapable of processing the necessary information to fully understand his condition. Drs. Vandenberg, Rutherford, and Kreitsch uniformly agreed that Michael does not possess the requisite capacity to satisfy the four-part test for evaluating decision-making capacity.
>
> This same conclusion was also reached by Dr. Ronald Cranford, a neurologist, whose testimony was accorded significant weight by the trial court. Dr. Cranford provided detailed testimony describing not only Michael's condition and level of functioning from a medical standpoint, but also the process involved in assessing Michael's cognitive capabilities during a recent evaluation. Dr. Cranford's evaluation demonstrated that, consistent with the testimony of the other medical experts, Michael possesses an ability to understand some simple questions concerning basic and familiar items, although even then his responses are not always consistent, but that he lacks an understanding of more complex items, including his physical capabilities and medical condition.
>
> Although one of respondents' experts, Dr. Walter Zetusky, a neuropsychologist, testified that he

evaluated Michael in 1990 and determined that he had an intelligence quotient of sixty-three, thus placing him at a higher level of cognitive functioning than that described by the other medical experts, the trial court accorded little probative value to the IQ testing. Significantly, the trial court noted that other medical experts questioned the validity of any IQ testing of Michael, and, further, that another expert, Dr. David Winstrom, in fact attempted to perform similar testing on Michael in April 1993, but was unable to do so, given Michael's inability to respond at a sufficient level to permit testing. More importantly, the trial court observed that not even Dr. Zetusky was able to provide unqualified testimony indicating that Michael has sufficient capacity to satisfy the four-part test for evaluating decision-making capacity.

Finally, it was the general consensus among the medical experts that Michael's condition and cognitive level of functioning will not improve in the future.

* * *

Testimony was received from respondent Major as well as two of Michael's former co-workers describing statements made by Michael before his accident wherein he expressed a preference not to be maintained in a coma or in a vegetative state. The trial court found . . . that Michael's present circumstances do not conform to those described by Michael when making those prior statements. However, testimony was also received from petitioner, who described numerous statements that were made to her by Michael before his accident, on different occasions and in different settings and contexts, all expressing a preference not to be maintained under various described circumstances. According to petitioner, Michael was adamant and made it very clear that he did not want to be kept alive in the circumstances described. The trial court found that the statements were sufficient in detail to establish Michael's previously expressed preference to decline life-sustaining medical treatment under the present circumstances. . . .

Prevalent throughout Michael's statements is the preference not to be maintained in a condition where he was incapable of performing basic functions such as walking, talking, dressing, bathing, or eating, and, instead, was dependent upon others or machines for his basic needs. . . .

Michael's discussions also reveal an express preference not to be maintained by machines in order to be kept alive. [205 Mich App 96, 100-104; 517 NW2d 749 (1994).]

On remand, after evaluating the evidence, the trial court found that the petitioner had demonstrated by clear and convincing evidence that, before his injuries, Mr. Martin expressed a medical preference to decline life-sustaining medical treatment under the circumstances presented.[4] The Court of Appeals concluded that, before his injuries, Mr. Martin specifically described circumstances under which he would decline life-sustaining medical treatment.[5] It stated that Mr. Martin's present condition fit squarely within the parameters that Mr. Martin specifically described.[6] Therefore, it held that the trial court's determination was not clearly erroneous.[7]

B

Although this case essentially concerns whether the appropriate evidentiary burden of proof has been met to support the lower courts' findings, the evidentiary issue may not be reached without first ascertaining whether the patient has a right to refuse life-sustaining medical treatment, and, if so,

---

[4] 205 Mich App 98-99.

[5] *Id.* at 104.

[6] *Id.*

[7] *Id.* at 102, 105-106.

whether a surrogate decisionmaker may exercise that right for a patient who is no longer able to do so for himself. After determining the extent of the right to decline life-sustaining medical treatment, we must decide how the surrogate is to effectuate the incompetent patient's decision, discern the appropriate evidentiary standard of proof, and determine whether the evidentiary standard has been satisfied in this case.

II

A

The right to decline life-sustaining treatment has been based on constitutional, common-law, and statutory sources. The Court of Appeals in *In re Rosebush,* 195 Mich App 675, 680; 491 NW2d 633 (1992), delineated the three sources of the right as follows:

(1) the common-law right to freedom from unwanted interference with bodily integrity,

(2) the constitutional right to privacy or liberty, or

(3) statute.

By deciding that Michigan recognizes "a right to withhold or withdraw life-sustaining medical treatment as an aspect of the common-law doctrine of informed consent," the *Rosebush* Court found it "unnecessary to decide the validity of the constitutional or statutory bases in Michigan." *Id.* at 680, n 1. As a prominent commentator in this area has noted, "the legal basis for the right to die is not important because courts have not made the scope of the right depend on whether or not the source is common-law[, statutory,] or constitutional."

Meisel, The Right to Die, § 3.4, p 50.[8] Because the evidentiary and decision-making standards appropriate in a given case do not depend on the source of the right, we need only ground the right in one source.

We agree with the *Rosebush* Court that a necessary corollary of the common-law right to informed consent is the right not to consent.[9] See *Cruzan v Director, Missouri Dep't of Health,* 497 US 261, 270; 110 S Ct 2841; 111 L Ed 2d 224 (1990); *Werth v Taylor,* 190 Mich App 141; 475 NW2d 426 (1991); *In re Conroy,* 98 NJ 321, 346-348; 486 A2d 1209 (1985); Meisel, *supra,* § 3.3, p 47, n 20. As noted by the Arizona Supreme Court:

> The purpose underlying the doctrine of informed consent is defeated somewhat if, after receiving all information necessary to make an informed decision, the patient is forced to choose only from alternative methods of treatment and precluded from foregoing all treatment whatsoever. [*Rasmussen v Fleming,* 154 Ariz 207, 216; 741 P2d 667 (1987).]

---

[8] Whether a patient's prerogative to spurn life-preserving treatment is grounded on constitutional privacy or on the common law doctrine of informed consent, the object remains to honor individual dignity by promoting self-determination and choice. [Cantor, Legal Frontiers of Death and Dying, ch 3, p 63.]

[9] While the patient's right to refuse life-sustaining medical treatment is not absolute and must be balanced against the countervailing interests of the state, see Meisel, *supra,* 1993 cum supp, § 3.2, p 24; *Cruzan v Director, Missouri Dep't of Health,* 497 US 261, 280-281, 283; 110 S Ct 2841; 111 L Ed 2d 224 (1990), by concluding that clear and convincing evidence is necessary to establish what the patient did decide, and finding such evidence lacking in this case, we need not address the interaction between the state's interest and a patient's decision to forgo treatment.

The state's interest is in the preservation of life. Given the absence of clear and convincing evidence about what Michael would do in this case, the state's interests and Michael's interest are not in conflict, and therefore no balancing is necessary.

Thus, because we find that the common-law doctrine of informed consent allows a person to refuse life-sustaining treatment, we also decline the invitation to reach the propriety of the constitutional and statutory issues in this case.

Given that a competent patient may decide to refuse medical treatment, the next inquiry is whether a decision to refuse medical treatment under the particular circumstances, made while competent, should be honored when the patient is incompetent.[10] Other jurisdictions that have addressed this question have unanimously concluded that a decision to refuse medical treatment in future situations, made while competent, is not lost because of incompetency or the inability to communicate. See *Rasmussen, supra* at 219; *In re Eichner v Dillon,* 73 AD2d 431, 470; 426 NYS2d 517 (1980) ("To deny the exercise because the patient is unconscious is to deny the right"); *Conroy, supra* at 359-361. We wish to make clear that we are deciding only that to the extent the right to refuse medical treatment "refers to decisions already made and communicated by the patient before losing the capacity to make further choices, . . . it is true that the patient's interest in having those choices honored must survive incapacity." Bopp & Avila, *Perspectives on* Cruzan:

---

[10] While both the petitioner and the respondent urge us to decide whether Michael's current actions express a present desire to accept treatment to the extent that he has repudiated any previous decision, we need not reach this question because we find that Michael's previous statements do not clearly and expressly demonstrate that he would want treatment withheld under these circumstances.

Although we question the standard the Court of Appeals applied to determine that Michael was unable to express a current desire to accept treatment, for purposes of this case we accept the lower courts' determinations that Michael is incompetent to make medical treatment decisions. The standard created by the Court of Appeals, in application, is equivalent to a general competency standard, a standard that has generally been rejected. See Meisel, *supra,* § 2.17, pp 31-32.

*The sirens' lure of invented consent: A critique of autonomy-based surrogate decisionmaking for legally-incapacitated older persons,* 42 Hastings L J 779, 806 (1991).

A third person must implement an incompetent patient's previously expressed decisions. Michigan's patient advocate act, MCL 700.496; MSA 27.5496, supports allowing a third person to execute the decisions of patients who are no longer able to effectuate those decisions for themselves. Pursuant to the patient advocacy act,[11] a currently competent person designates a surrogate, the patient advocate, to make treatment decisions in the event the patient is incapacitated. A proper designation allows a third person to execute the patient's treatment decisions, even if the decision will result in death, provided the patient is in the condition delineated in the patient advocate designation.

III

Having concluded that a person's right to refuse life-sustaining medical treatment survives incompetency and may be discharged by a surrogate decisionmaker, we now address how the surrogate effectuates the incompetent patient's decision.

While the facts of this case present an issue of first impression in Michigan, we find guidance in the decisions of our sister states that have addressed the possible surrogate decision-making standards.

Courts have created "two traditional [decisionmaking] standards for guiding guardians in carry-

---

[11] We are careful to note that Michael did not designate a patient advocate pursuant to the act because his injury occurred nearly four years before this legislation was enacted. We express no opinion about how the act and its provisions should be interpreted because that question is not before us.

ing out their responsibilities: the best interests standard and the substituted judgment standard." Meisel, *supra,* § 9.6, p 264.[12]

The best interest standard[13] is an objective analysis under which the benefits and burdens to the patient of treatment are assessed by the surrogate in conjunction with any statements made by the patient if such statements are available. *Conroy, supra* at 360-368. The best interest analysis is generally invoked, if at all, only as a secondary approach when subjective evidence of a particular patient's decision is lacking because it involves a qualitative assessment of the patient's condition, a decision the state may legitimately decline to make. *Cruzan, supra* at 282.

The substituted judgment standard has subjec-

---

[12] Contrary to a growing misconception, see *DeGrella v Elston,* 858 SW2d 698 (Ky, 1993); *In re Rosebush, supra* at 688, n 7; *In re Fiori,* 438 Pa Super 610, 651; 652 A2d 1350 (1995); Meisel, *supra,* 1993 cum supp, § 10A.2, p 284, we view the clear and convincing standard not as a decision-making standard, but as an evidentiary standard of proof that applies to all decisions regarding termination of treatment, regardless of the decision-making standard employed.

> In right to die cases, if intent to withdraw life prolonging medical procedures is determinative of the case, then there must be "clear and convincing evidence" of that intent. If "best interests" of the patient is determinative of the case, then there must be "clear and convincing evidence" that discontinuance of medical procedures best serves the interests of the patient. [Gorby, *Admissibility and weighing evidence of intent in right to die cases,* 6 Issues in Law & Medicine 33, 43 (1990).]

[13] The *Conroy* court separated the best interest standard into two separate strands: the "limited objective" standard and the "pure objective" standard. The limited objective standard first examines any statements made by the patient that do not amount to clear and convincing evidence, as required by the pure subjective standard, and incorporates an objective assessment of the benefits and burdens to the patient of continued treatment. *Id.* at 365-366. Under the pure objective standard, treatment may be withdrawn where the burdens of treatment clearly outweigh any benefits to the patient. *Id.* Given that both these standards employ objective criteria, factors we decline to address under the facts of this case, the differences between these two standards are not relevant.

tive and objective components. Through this standard, the surrogate attempts to ascertain, with as much specificity as possible, the decision the incompetent patient would make if he were competent to do so. The surrogate first determines whether the patient, while competent, explicitly stated his intent regarding the type of medical treatment in question. *In re Westchester Co Medical Center,* 72 NY2d 517; 534 NYS2d 886; 531 NE2d 607 (1988). Where there is no explicit evidence of what the patient would choose, the surrogate may still decide to terminate treatment on the basis of evidence of the patient's "value system." *In re Longeway Estate,* 133 Ill 2d 33, 49; 549 NE2d 292 (1989). The surrogate should determine the patient's "value system" through an assessment of the patient's behavior during the time he was competent

> "including his or her philosophical, religious and moral views, life goals, values about the purpose of life and the way it should be lived, and attitudes toward sickness, medical procedures, suffering and death . . . ." [*In re Jobes,* 108 NJ 394, 415; 529 A2d 434 (1987), quoting Newman, *Treatment refusals for the critically ill: Proposed rules for the family, the physician and the state,* III NY L S Human Rights Annual 45-46 (1985).]

Courts have generally acknowledged that the substituted judgment standard entails some level of objective analysis. *Conroy, supra* at 363-364. For this reason, commentators, as well as many judges, have forcefully assailed the substituted judgment standard as a legal fiction that in reality substitutes the surrogate's decision to withdraw treatment for that of the patient. See Bopp & Avila, *supra; Cruzan, supra* at 285; *DeGrella v Elston,* 858 SW2d 698, 710-711 (Ky, 1993) (Lambert, J.,

concurring); *In re Longeway Estate, supra* at 55 (Ward, J., dissenting) at 65 (Clark, J., dissenting).

Rather than choose between the best interest standard and the substituted judgment standard, the New Jersey Supreme Court attempted to synthesize these two standards by creating an hierarchical decision-making continuum. *Conroy, supra.* The starting point on the continuum is anchored by a purely subjective analysis, an approach that requires more definitive evidence of what the patient would choose than the substituted judgment standard. The other end of the continuum is anchored by a purely objective analysis, which is, in essence, a best interest standard.

We find that a purely subjective analysis is the most appropriate standard to apply under the circumstances of this case. The pure subjective standard allows the surrogate to withhold life-sustaining treatment from an incompetent patient "when it is clear that the particular patient would have refused the treatment under the circumstances involved." *Conroy, supra* at 360. Given that the right the surrogate is seeking to effectuate is the incompetent patient's right to control his own life, "[t]he question is not what a reasonable or average person would have chosen to do under the circumstances but what the particular patient would have done if able to choose for himself." *Id.* at 360-361. The patient's statements, made while competent, must illustrate "a firm and settled commitment to the termination of life supports under the circumstances like those presented." *In re Westchester, supra* at 531.

The subjective and objective standards involve conceptually different bases for allowing the surrogate to make treatment decisions. The subjective standard is based on a patient's right to self-determination, while the objective standard is grounded

in the state's parens patriae power. *Conroy, supra, Cruzan v Harmon,* 760 SW2d 408 (Mo, 1988). An objective, best interest, standard cannot be grounded in the common-law right of informed consent because the right and the decision-making standard inherently conflict. The Illinois Supreme Court recently explained this conflict:

> The problem with the best-interests test is that it lets another make a determination of a patient's quality of life, thereby undermining the foundation of self-determination and inviolability of the person upon which the right to refuse medical treatment stands. [*In re Longeway Estate, supra* at 49.][14]

Thus, while the facts of the present case do not require that we decide whether the state's parens patriae authority may be expansive enough to encompass a best interest analysis, we do note that such an analysis cannot be based on the common-law right of informed consent.

Although respondent accurately notes that the Florida Supreme Court in *In re Guardianship of Browning,* 568 So 2d 4, 13 (Fla, 1990), believed that the common-law right of self-determination "cannot be qualified by the condition of the patient," any move from a purely subjective standard to an analysis that encompasses objective criteria is grounded in the state's parens patriae power, not in the common-law right of informed consent or self-determination. Thus, while the clearly expressed wishes of a patient, while competent, should be honored regardless of the patient's condition, we find nothing that prevents the state

---

[14] See also *Conroy, supra* at 364, in which the court stated that "in the absence of adequate proof of the patient's wishes, it is naïve to pretend that the right to self-determination serves as the basis for substituted decision-making."

from grounding any objective analysis on a threshold requirement of pain, terminal illness, foreseeable death, a persistent vegetative state, or affliction of a similar genre.

While the circumstances of some cases have led courts to progress along the decision-making continuum and apply tests that encompass more objective criteria, see *Conroy* and *Rosebush, supra,* the facts of this case do not present us with that situation. In the cases that have applied a more objective test or suggested that an objective test would be proper, the patient generally has been comatose or in a persistent vegetative state, *In re Jobes, supra; In re Torres,* 357 NW2d 332 (Minn, 1984) (terminally ill); *In re Guardianship of Barry,* 445 So 2d 365 (Fla App, 1984) (experiencing great pain); *Conroy, supra* at 365 (very limited life expectancy); *In re Rosebush, supra* (never been competent or able to express her wishes or desires).[15] In this case, Michael's life and health are not threatened by infirmities of this nature. Because he was competent and able to express his wishes and desires, we decline to move along the continuum from the subjective standard.[16]

---

[15] We express no opinion about the proper decision-making standard for patients who have never been competent, patients existing in a persistent vegetative state, patients who are experiencing great pain, or patients who are terminally ill. If a patient has any of these conditions, or ailments of a similar nature, a more objective approach may be necessary and appropriate.

The facts of each case present unique circumstances, and it would be

> unrealistic for us to attempt to establish a rigid set of guidelines to be used in all cases requiring an evaluation of a now-incompetent patient's previously expressed wishes. The number and variety of situations in which the problem of terminating artificial life supports arises preclude any attempt to anticipate all of the possible permutations. [*In re Westchester, supra* at 529-530.]

[16] Even if a test involving objective criteria were applicable in this

In all cases where the courts have been persuaded that the patient, while competent, made clear and convincing statements that he would reject treatment under the circumstances at issue, the patient's decision has been honored, regardless of whether the patient is currently competent. The Kentucky Supreme Court recently noted that all but Missouri[17] and New York[18] would allow treatment to be withdrawn under a substituted judgment standard even where the express wishes of the patient are unclear. *DeGrella, supra.*[19] Missouri and New York only allow treatment to be withheld when it is clear that the particular patient, while competent, expressly decided to reject treatment in the circumstances presented. *In re Westchester, supra* at 531-532; *Cruzan v Harmon,* 760 SW2d 426.

The subjective standard has been attacked as possibly creating too stringent a standard, inhu-

case, the objective criteria would only strengthen our decision that nutrition and hydration should continue to be provided. As the court in *Conroy, supra,* noted the burdens to the patient could only outweigh the benefits of continued treatment if

> the patient is suffering, and will continue to suffer throughout the expected duration of his life, unavoidable pain, and that the net burdens of his prolonged life (the pain and suffering of his life with the treatment less the amount and duration of pain that the patient would likely experience if the treatment were withdrawn) markedly outweigh any physical pleasure, emotional enjoyment, or intellectual satisfaction that the patient may still be able to derive from life. [*Id.* at 365.]

By all accounts, Michael is not experiencing any type of pain that would outweigh any enjoyment or pleasure he is experiencing.

[17] *Cruzan v Harmon, supra.*

[18] *In re Storar,* 52 NY2d 363; 420 NE2d 64 (1981); *In re Westchester, supra.*

[19] It is unclear whether Kentucky adopted the substituted judgment standard in *DeGrella.* Justice Lambert, concurring, highlighted the inconsistency in the majority's discussion of this issue and explained that because there was clear and convincing evidence of what Ms. DeGrella would choose, it was not necessary for the majority to adopt the substituted judgment standard in that case. *Id.* at 711.

manely condemning a patient to a "prolonged and painful death," *Conroy, supra* at 364, however, the facts of this case do not dictate that we progress beyond a purely subjective standard, and we refuse to do so. We cannot stress too strongly that the complexity and ramifications of any decision in this area caution against moving too swiftly or adopting controversial decision-making standards in cases that do not present facts compelling such decision. The right of informed consent extends only to the decisions this particular patient has made. Any objective analysis is not encompassed within the right of informed consent. As we noted at the outset, if we are to err, we must err in preserving life. Our first step in this area must be a careful one.

## IV

Having concluded that a surrogate may make treatment decisions for a patient who is unable to do so on the basis of that specific patient's statements made while competent, we must now decide the evidentiary standard of proof those statements must meet before the surrogate is allowed to effectuate them.

Proof may be required by a preponderance of the evidence, by clear and convincing evidence, or beyond a reasonable doubt. The predominant evidentiary standard chosen by the courts that have addressed this question, however, is clear and convincing evidence. Meisel, *supra,* § 8.38, p 254. In affirming the Missouri Supreme Court's choice of the clear and convincing evidence standard, the United States Supreme Court explained why the clear and convincing evidence standard should be chosen over the preponderance standard.

We think it self-evident that the interests at stake in the instant proceedings are more substantial, both on an individual and societal level, than those involved in a run-of-the-mine civil dispute. [*Cruzan,* 497 US 283.]

Because the party who bears the more stringent burden of proof also bears a greater risk of an adverse decision, the Court found it proper to

place an increased risk of an erroneous decision on those seeking to terminate an incompetent individual's life-sustaining treatment. An erroneous decision not to terminate results in a maintenance of the status quo; the possibility of subsequent developments such as advancements in medical science, the discovery of new evidence regarding the patient's intent, changes in the law, or simply the unexpected death of the patient despite the administration of life-sustaining treatment at least create the potential that a wrong decision will eventually be corrected or its impact mitigated. An erroneous decision to withdraw life-sustaining treatment, however, is not susceptible of correction. [*Id.*]

Litigants also have argued for adoption of the "beyond-a-reasonable-doubt standard,"[20] although no court has embraced this stringent of a standard. Meisel, *supra,* § 8.38, p 254. Generally, "the 'beyond a reasonable doubt' standard historically has been reserved for criminal cases," and the Supreme Court has cautioned against "apply[ing] it too broadly or casually in noncriminal cases." *Addington v Texas,* 441 US 418, 428; 99 S Ct 1804; 60 L Ed 2d 323 (1979). Because the decision to refuse life-sustaining treatment is not a punitive exercise of the state's authority, we agree that the

---

[20] See *Eichner, supra* at 472; *Leach v Akron General Medical Center,* 68 Ohio Misc 1; 426 NE2d 809 (1980).

criminal standard "is inappropriate in cases where the purpose of granting the relief is to give effect to an individual's right by carrying out his stated intentions." *In re Storar,* 52 NY2d 363, 379; 420 NE2d 64 (1981).

We agree that the clear and convincing evidence standard, the most demanding standard applied in civil cases,[21] is the proper evidentiary standard for assessing whether a patient's statements, made while competent, indicate a desire to have treatment withheld.[22] Evidence is clear and convincing when it

> "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." . . . Evidence may be uncontroverted, and yet not be "clear and convincing." . . . Conversely, evidence may be "clear and convincing" despite the fact that it has been contradicted. [*In re Jobes, supra* at 407-408.]

Among the factors identified as important in defining clear and convincing evidence, see *In re Westchester, supra; Eichner, supra,* the predomi-

---

[21] [I]n civil cases, the clear and convincing evidence standard is typically thought to be the highest level that can be required. Thus, where the threat of deprivation of a fundamental right will trigger proof beyond a reasonable doubt in criminal cases, it would only call for the clear and convincing standard in civil cases. [Forte, *The role of the clear and convincing evidence standard of proof in right to die cases,* 8 Issues in Law & Medicine 183, 188-189 (1992).]

[22] Our conclusion that clear and convincing evidence is the proper standard is in harmony with the patient advocate act, which also requires clear and convincing evidence that the patient would allow treatment to be withheld if such a decision would lead to the patient's death. MCL 700.496(6); MSA 27.5496(6).

nant factor is "a prior directive in which the patient addresses the situations in which the patient would prefer that medical intervention cease." Cantor, Legal Frontiers of Death and Dying, ch 3, p 64. Optimally, the prior directive would be expressed in a living will, patient advocate designation, or durable power of attorney. While a written directive would provide the most concrete evidence of the patient's decisions, and we strongly urge all persons to create such a directive, we do not preclude consideration of oral statements, made under the proper circumstances.

The amount of weight accorded prior oral statements depends on the remoteness, consistency, specificity, and solemnity of the prior statement. *Conroy, supra* at 362. The decisionmaker should examine the statement to determine whether it was a well thought out, deliberate pronouncement or a casual remark made in reaction to the plight of another. *In re Westchester, supra* at 529. Statements made in response to seeing or hearing about another's prolonged death do not fulfill the clear and convincing standard.

> If such statements were routinely held to be clear and convincing proof of a general intent to decline all medical treatment once incompetency sets in, few nursing home patients would ever receive life-sustaining medical treatment in the future. The aged and infirm would be placed at grave risk if the law uniformly but unrealistically treated the expression of such sentiments as a calm and deliberative resolve to decline all life-sustaining medical assistance once the speaker is silenced by mental disability. [*Id.* at 532.]

While the degree of similarity between the physical conditions contemplated in the patient's prior statement and the patient's current physical situa-

tion also partakes of the fiction of substituted judgment, we do not exclude it as a factor to be considered in assessing the probative value of the prior statement. Only when the patient's prior statements clearly illustrate a serious, well thought out, consistent decision to refuse treatment under these exact circumstances, or circumstances highly similar to the current situation, should treatment be refused or withdrawn. In all events, the proofs in sum must meet the exacting standard of clear and convincing evidence.

V

In the present case, appellants claim that Mr. Martin expressed a preaccident statement that he did not want to live like a vegetable. However, our review of the record reveals that virtually all the witnesses agreed that Mr. Martin is not in a vegetative state and is not suffering from the type of incapacitation referenced in his expression of a desire not to continue life-sustaining medical treatment.

Appellants argue that Mary Martin's uncorroborated affidavit and trial testimony do not constitute clear and convincing evidence of Mr. Martin's preinjury desire to refuse hydration and nutritive support. Appellants argue that, assuming Mary Martin's statements are truthful representations of statements made by Mr. Martin, the remarks,

> if truly made to the Guardian, were remote in time and place from his present circumstances. At the time the remarks were supposedly made, Michael was young and healthy. The remarks were general, vague and casual, because Mr. Martin was not presently experiencing and likely never had experienced the form of "helplessness" he supposedly disliked, and thus, he could not bring

to bear his specific views about specific circumstances of which he was intimately knowledgeable. Not being informed by his actual experience, Michael's purported remarks thus were "no different than those that many of us might make after witnessing an agonizing death of another." [Citation omitted.]

Appellee responds that there was no evidence that Mr. Martin's decision regarding prolonged existence on artificial life support has ever changed. Thus, appellee argues that a competent person's strongly held and well thought out decisions about treatment, if proven by clear and convincing evidence, should not be superseded without equally clear and convincing evidence that the person, now incompetent, understands his condition and has changed his mind about previously expressed treatment desires.

Our review of the lower court records reveals that, in determining whether clear and convincing evidence was presented to establish that Mr. Martin had previously expressed a preference to decline life-sustaining medical treatment under the present circumstances, the trial court relied on petitioner's testimony and supporting affidavit in which she stated:

4. Discussions between Mike and me regarding what our wishes would be if either of us was ever involved in a serious accident, had a disabling or terminal illness or was dying of old age, began approximately eight years ago. These discussions occurred on many different occasions. As I indicate below, several were triggered by movies which we saw together. Mike's position was always the same: he did not want to be kept alive on machines and he made me promise that I would never permit it.

5. Some of the conversations that we had about

medical care in this context occurred after we watched movies about people who no longer were mentally competent either due to illness, accident, or old age; others involved people who could no longer do anything for themselves, such as persons who lived in a nursing home and could no longer feed or dress themselves and needed to wear diapers or have other measures taken to continue existing. Mike stated to me on several occasions: "That's bullshit, I would never want to live like that." He also said to me, "Please don't ever let me exist that way because those people don't even have their dignity." I always agreed with Mike because I felt the same way.

6. One movie that always triggered such discussions was "Brian's Song" which, I recall, is a movie about a football player with a terminal illness. Mike said to me after we saw it together: "If I ever get sick don't put me on any machines to keep me going if there is no hope of getting better." He also said that if I ever put him on machines to keep him alive: "I'll always haunt you, Mary." Then he would say, "Do you understand?" I always said "Yes." We watched this movie at least two or three times and had virtually the same discussion each time.

7. Some movies that triggered our discussions were about accidents—car accidents, hunting accidents or other accidents near home or in water. Mike was an avid hunter and frequently expressed concerned [sic] about a hunting accident. Mike frequently told me that if he ever had an accident from which he would "not recover" and "could not be the same person," he did "not want to live that way." He would say, "Mary, promise me you wouldn't let me live like that if I can't be the person I am right now, because if you do, believe me I'll haunt you every day of your life." I stated my promise to him and made him promise me the same.

8. Mike also made a lot of comments to me about never wanting to live "like a vegetable." He said that if anyone had to live like a vegetable,

"their families and doctors should be shot for forcing someone to live like that." He would say, "I'd be pissed if I had to live that way." He also told me that he believed it was unfair to the person who had to be kept alive on machines because that person would always be in pain. He told me that "no one should have to be kept alive if they would never get well again."

9. December 1986 was the last time that I remember discussing this subject with Mike. I was having surgery on New Years' Eve Day and we discussed our wishes if either of us was severely incapacitated. The impending surgery prompted me to tell Mike of my wishes not to be maintained artificially. Mike then told me that he would respect my wishes and he expected the same in return if anything ever happened to him.

10. I am certain that were Mike able to speak today, he would direct that the artificial life support and antibiotic treatments be withdrawn so that he might die in a dignified manner consistent with his explicit wishes expressed to me prior to the accident. It is time that my husband be freed from the ghastly, demeaning existence which he so strongly opposed.

11. I know that Mike spoke with some of his co-workers about his disdain for being maintained by artificial means of life support. One of those co-workers, Warren Hawley, specifically discussed this with me at the time Mike was admitted to the Grand Valley Nursing Home.

This testimony and affidavit cannot be viewed in a vacuum. There was also testimony from two of Mr. Martin's co-workers, stating that Mr. Martin's present condition is not the type referred to in conversations with them before his injury. Dr. Kreitsch testified that Mr. Martin seemed content with his environment. Dr. Kreitsch, several therapists, and several lay witnesses testified that Mr. Martin could respond to simple yes or no questions by nodding his head. They also testified that he

indicated a no response when asked if he ever felt that he did not want to continue living.

We do not believe that the testimony and affidavit of Mary Martin, Mr. Martin's wife and guardian, constitute clear and convincing evidence of Mr. Martin's preinjury statement of his desire to refuse life-sustaining medical treatment under these specific circumstances. We are not satisfied that the evidence is "so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Cruzan,* 497 US 285, n 11. Thus, the clear and convincing evidence standard has not been satisfied.[23]

In the absence of clear and convincing evidence of Mr. Martin's preinjury statement expressing his decision to refuse life-sustaining medical treatment under the present circumstances, we will not authorize the removal of life-sustaining medical treatment. Our determination is consistent with the furtherance of this state's interest in preserving the sanctity of life and does not abridge Mr. Martin's right to refuse life-sustaining medical treatment.

### CONCLUSION

We hold that, once it is determined that the individual is conscious and was competent at some

---

[23] The dissent argues that an appellate court may only reverse trial court findings of fact if they are clearly erroneous. The majority is accused of disrespecting the trial court's role as factfinder and engaging in a de novo review of the facts. Nothing could be further from the truth. The majority's careful review of the entire record created below did not involve a search for new facts as the dissent suggests. Instead, it was a search designed to answer a singularly important question of law: Do the facts presented below provide a sufficient evidentiary basis for the trial court's determination that the rigorous demands of the clear and convincing standard were met? The majority's respect for the careful work of our colleagues below will not excuse an abdication of responsibility.

time before his present injuries were sustained, a surrogate decisionmaker cannot make a decision for or in place of a conscious incapacitated individual regarding his decision to waive the right to continue life-sustaining medical treatment. However, where the surrogate decisionmaker can establish by clear and convincing evidence that the conscious incapacitated individual, while competent, made a statement of his desire to refuse life-sustaining medical treatment under these circumstances, then the surrogate must be allowed to effectuate the incapacitated individual's expressed preference. In the absence of clear and convincing evidence of the conscious incapacitated individual's preinjury statement expressing his decision to refuse life-sustaining medical treatment under the present circumstances, courts will not authorize the removal of life-sustaining medical treatment.

Accordingly, we reverse the Court of Appeals determination because petitioner's testimony and affidavit do not constitute clear and convincing evidence of Mr. Martin's preinjury decision to decline life-sustaining medical treatment in the form of a gastrostomy tube that provides hydration and nutritive support.

We do not retain jurisdiction.

BRICKLEY, C.J., and CAVANAGH, BOYLE, RILEY, and WEAVER, JJ., concurred with MALLETT, J.

LEVIN, J. (*dissenting*). Two issues are presented. The first is whether the trial court clearly erred in finding by clear and convincing evidence that before his injuries, Michael Martin expressed a medical "preference to decline life-sustaining medical treatment under the circumstances presented."[1]

---

[1] *In re Martin (After Remand)*, 205 Mich App 96, 99; 517 NW2d 749 (1994) (*Martin II*).

The second asks what showing, if any, justifies the withdrawal of life-sustaining medical treatment in the absence of clear and convincing evidence of such preinjury wishes.

I dissent from the majority's holdings on both issues. On the second issue, I do not agree with the majority that, on the facts of this case, life-sustaining medical treatment can only be removed with clear and convincing evidence of the patient's expressed preinjury wishes. I would not reach the question what showing, other than clear and convincing evidence, would justify withdrawal of life-sustaining medical treatment, because the trial court did not clearly err in finding that clear and convincing evidence was presented that Michael Martin, before his injury, did not want to be kept alive in his current condition.

I

The Court of Appeals began by noting that a competent adult has a right to refuse life-sustaining medical treatment, and that an incompetent patient, while not losing this right, must have it exercised by a surrogate decisionmaker.[2] The Court explained that if a patient has the capacity to decide whether to accept life-sustaining medical treatment, it is his decision to make. Before the choice can be made by anyone other than the patient, there must be clear and convincing evidence that the patient lacks this capacity and will not regain it in the future. If such evidence is shown, a decisionmaker should then ask whether there is clear and convincing evidence of the patient's previously expressed desires regarding life support under the conditions in which the court

[2] *In re Martin,* 200 Mich App 703, 713; 504 NW2d 917 (1993) (*Martin I*).

finds the patient to be. If so, those desires must be effectuated.[3] This is a purely subjective inquiry into the patient's prior wishes.[4]

Up to this point, the majority and the Court of Appeals would apply a similar analysis.[5] The majority does not dispute the trial and appellate courts' conclusion that Michael Martin permanently lacks the capacity to exercise his right to have life-sustaining medical treatment removed.[6] The majority disagrees with the finding that clear and convincing evidence has been presented of Michael Martin's preinjury wishes.[7]

II

In ruling that clear and convincing evidence has not been presented, the majority becomes the first disinterested body to examine Michael Martin's case without being convinced by the ample evidence of his prior wishes.

The bioethics committee of the hospital caring for Michael concluded that the request to remove life-sustaining medical treatment "was in accord with Mr. Martin's wishes as expressed . . . prior to his injury." The court-appointed guardian ad litem—whose role is to represent Michael's best interests—also recommended the withdrawal of life support. The trial court and Court of Appeals

[3] *Id.,* p 713.

[4] Meisel, The Right to Die, § 9.10, p 270.

[5] As the majority notes, the requirement of clear and convincing evidence is not an entirely different standard. It is simply the burden of proof for the exercise of the substantive inquiries. Meisel, n 4 *supra,* 1994 cum supp, § 8.38, p 230. Some authorities, however, have used it as shorthand for a court's refusal to allow removal of life-sustaining medical treatment absent clear and convincing evidence of a patient's prior wishes. See, e.g., Beebe, *The right to die: Who really makes the decision?,* 96 Dick L R 649 (1992).

[6] *Ante,* p 217, n 10.

[7] *Id.,* p 207.

agreed that Michael "clearly and convincingly reveal[ed] his expressed preference to decline life-sustaining medical treatment under the circumstances presented."[8]

Evidence is "clear and convincing" when it

> "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."[9]

The probative value of a once-competent patient's past statements about life-sustaining medical treatment varies, "depending on the[ir] remoteness, consistency, and thoughtfulness," as well as their specificity and the maturity of the person making the statement.[10]

An appellate court may only reverse a trial court's findings of fact if they are clearly erroneous.[11] Instead of respecting the trial court's role as factfinder, the majority has engaged in a de novo review of the facts. It ignores the admonition that in cases like this an appellate court "must also be cognizant of the profound responsibility which has been vested in the trial court and should not substitute its judgment for that of a trial court."[12]

The evidence adduced at trial demonstrated Michael's deeply felt, consistent, and long-term desire not to be maintained artificially in a helpless condition. Michael's sister Patricia Major—one of

---

[8] *Martin II,* n 1 *supra,* p 105.

[9] *In re Jobes,* 108 NJ 394, 407; 529 A2d 434 (1987); (quoting *State v Hodge,* 95 NJ 369, 376; 471 A2d 389 [1984]).

[10] *In re Conroy,* 98 NJ 321, 362; 486 A2d 1209 (1985).

[11] *In re Cornet,* 422 Mich 274, 277-278; 373 NW2d 536 (1985).

[12] *In re Fiori,* 438 Pa Super 610, 637; 652 A2d 1350 (1995).

the appellants seeking to keep him alive—testified that even as a teenager Michael told her seriously that he did not want to be maintained on a respirator while unconscious. He later told friends and co-workers that "if he ever was in a [sic] accident & was in a vegetable [sic] state, he hoped someone pulled the plug."

The majority dismisses these statements because they referred to a persistent vegetative state, rather than Michael's current condition.[13] But the bioethics committee concluded that

the persistence of [Mr. Martin's] condition and the level of functioning were equivalent to a persistent vegetative state for purposes · of considering the removal of nutrition support . . . .

While not vegetative, Michael has minimal cognition and essentially no ability to communicate. Additionally, as one physician testified, when laypersons express a desire not to be a "vegetable," they usually are not referring strictly to a persistent vegetative state. Rather, the popular understanding involves a "spectrum of things, but the commonality of that is, independence of life . . . things in terms of basic needs of [the] human body,—bathing, eating and able to void."

Moreover, Michael did not refer only to life as a "vegetable." These statements must be viewed in combination with the testimony of Mary Martin. Mary testified about a series of conversations with Michael over a period of years, in which he expressed his desire not to be kept alive artificially if "he had to be dependent on people and machines . . . ." She testified that his concern was not with being unconscious, but with being dependent on others for the most basic bodily functions.

---

[13] *Ante,* p 229.

As the Court of Appeals stated:

> Prevalent throughout Michael's statements is the preference not to be maintained in a condition where he was incapable of performing basic functions such as walking, talking, dressing, bathing, or eating, and, instead, was dependent upon others or machines for his basic needs. This is exactly the condition in which Michael now finds himself.[14]

The conversations between Michael and Mary were not merely idle talk or emotional reactions to watching other persons suffer.[15] Mary testified that the last conversation occurred as she was awaiting surgery for internal hemorrhaging. Michael and Mary each promised not to leave the other dependent on artificial life support, should such a tragedy occur. Mary's affidavit reported that Michael told her on one occasion that if she left him dependent on machines, "I'll always haunt you, Mary."

Not even the two appellants seeking to keep Michael alive offer any basis for questioning the veracity of this testimony. Michael's sister, Patricia Major, conceded she had no reason to doubt that these conversations had occurred.[16] His mother, Leeta Martin, also testified that before the accident, Michael "would not have wanted to be helpless and dependent on others."[17]

Other courts have found clear and convincing evidence of prior expressed wishes from similar or less compelling testimony than that in this case.

---

[14] *Martin II,* n 1 *supra,* pp 103-104.

[15] *Ante,* pp 230-232.

[16] *Id.,* pp 229-230.

[17] Leeta Martin argued that, if the court found Michael lacked the capacity to decide his own fate, his prior wishes should not control because "when the good Lord wants him, the good Lord will take him."

See, e.g., *In re Swan,* 569 A2d 1202, 1205 (Me, 1990), affirming a finding of clear and convincing evidence of a prior expressed decision where a seventeen-year-old patient, after seeing or hearing of others receiving life-sustaining medical treatment, had twice expressed orally a desire not to be maintained artificially, *Elbaum v Grace Plaza of Great Neck,* 148 AD2d 244, 249-254; 544 NYS2d 840 (1989), ruling that oral statements to family members made over a period of years, most of which were in response to observing others receiving life-sustaining medical treatment, constituted clear and convincing evidence of the patient's prior wishes.[18]

The majority insists that a person's wishes are not clearly known unless the applicable medical conditions are accurately specified.[19] In effect, this requirement will force most persons to seek legal assistance to assure that their wishes will be effectuated. By referring to being "dependent" or a "vegetable," Michael was

> "express[ing] [his] wishes in the only terms familiar to [him], and . . . as clearly as a lay person should be asked to express them. To require more is unrealistic, and for all practical purposes, it precludes the right of patients to forego life-sustaining treatment.[20]

[18] See also *In re Guardianship of Browning,* 568 So 2d 4, 17 (Fla, 1990). Browning had executed a written declaration providing that life-sustaining medical treatment should be withheld if she were terminally, irreversibly ill and her death were imminent. A stroke left her in a condition similar to Michael Martin's in which she was dependent on artificial nutrition. Despite her ability to live indefinitely on the feeding tube, the court permitted withdrawal of life-sustaining medical treatment under the dictates of her directive.

[19] *Ante,* p 229, requiring that the prior statements describe "these exact circumstances, or circumstances highly similar" to the patient's current condition.

[20] *Cruzan v Director, Missouri Dep't of Health,* 497 US 261, 324; 110 S Ct 2841; 111 L Ed 2d 224 (1990) (Brennan, J., dissenting), quoting *In*

The majority also states that "[s]tatements made in response to seeing or hearing about another's prolonged death do not fulfill the clear and convincing standard."[21] This bright-line rule ignores that many persons only consider their own mortality seriously upon hearing about the end of other people's lives. Admittedly, the emotional content of such statements must be carefully considered in weighing their probative value. But the majority's "categorical exclusion of [this] relevant evidence dispenses with any semblance of accurate factfinding."[22]

The majority's treatment of the evidence in this case suggests that it would require a highly formal oral or written statement concerning the patient's specific medical condition. To impose such rules would be unrealistic.[23]

*re Westchester Co Medical Center,* 72 NY2d 517, 551; 531 NE2d 607 (1988) (Simons, J., dissenting).

[21] *Ante,* p 228.

[22] *Cruzan,* n 20 *supra,* p 321 (Brennan, J., dissenting), criticizing the Missouri court's refusal to consider such evidence. See also *Conroy,* n 10 *supra,* p 361, noting that prior statements of intent "might take the form of reactions that the patient voiced regarding medical treatment administered to others."

[23] For various reasons, most persons neglect to formalize their wishes this way, even though they may feel strongly about them. *Cruzan,* n 20 *supra,* pp 323-324.

Appellants also argue that even if clear and convincing evidence exists of Michael's preaccident wishes not to continue life-sustaining medical treatment in this situation, he has since changed his mind. They claim that he has shown "a present desire to accept treatment . . . ." The majority does not reject this contention. *Ante,* p 217, n 10. The evidence, however, demonstrates that Michael lacks the ability to understand or express a decision about ending his life.

The majority does not question the trial court's ruling that "Michael does not have, nor will he regain, sufficient decision-making capacity with respect to a decision to withdraw life-sustaining medical treatment." *Martin II,* n 1 *supra,* p 100. Several physicians testified at trial that Michael has only a very limited comprehension of his condition. Doctors testified that he lacks the capacity to "understand[ ] the treatment choices, [ ]or the consequences of those." One physician opined that Michael could comprehend a question phrased

### III

Petitioner presented clear and convincing evidence of her husband's prior wishes. As a result, I would not decide in this case whether the search for clear and convincing evidence of a patient's previously expressed wishes needs to be followed by another subjective inquiry, an objective inquiry, or some amalgam of the two.

Although the trial court found that clear and convincing evidence had been presented, the Court of Appeals outlined additional steps for a decisionmaker to take when such evidence is lacking. It stated that in such a case, the decisionmaker should next apply a "substituted judgment" standard. This would require some trustworthy evidence of the patient's preinjury wishes, even if less than clear and convincing evidence. In addition, if this evidence suggests the patient would want treatment withdrawn under the conditions that exist, the court must also decide that the burdens of prolonged life outweigh its benefits before allowing withdrawal.[24]

Finally, if there is no evidence at all of the patient's prior wishes, the Court of Appeals stated that a pure best interests standard should be applied. This is also referred to as an "objective" test, because it seeks to determine a patient's

---

in terms of "does he want to live or die?" Another doctor disagreed, however.

Michael lacks the ability to communicate. The guardian ad litem testified that Michael "is unable to communicate on any meaningful level." Appellants point to Michael's head nods and constant smile as evidence of his desire to live. But the head nods given "in response" to questions are far too inconsistent to allow him to communicate with any effectiveness.

In light of Michael's inability to express or even understand such a choice, appellants' claim that he has changed his mind about life-sustaining medical treatment seems overly optimistic at best. Their well-intentioned hopes should not be allowed to override the wishes he clearly expressed while competent.

[24] *Martin I,* n 2 *supra,* p 712.

objective best interests rather than his subjective wishes.[25] The Court of Appeals explained:

> The logic of this sequential analysis is rooted in the fact that, as we progress from one step to the next, we are moving away from deferring to the wishes of the patient to the point where we allow others (fiduciaries, family members, ethics committees, and courts) to decide whether the patient will live or die without reference to the patient's wishes. Our premise is that this should not be permitted except as a last resort, given society's reverence for life and its acknowledgment that patients have an inherent right of self-determination. Nevertheless, we may not eliminate [the pure best interests approach] because to do so would be to hold that where the patient is incompetent, never expressed a preference, and the court cannot determine what the patient would do under existing circumstances, life support may never be withdrawn. That is not the current state of the law.[26]

This approach originated with the New Jersey Supreme Court decision in *In re Conroy*,[27] and has been praised by commentators.[28]

IV

The majority would make Michigan one of a small minority of states to forbid termination of life support unless clear and convincing evidence is presented that the patient has expressly stated his wishes that it be removed under the specific

---

[25] Meisel, n 4 *supra*, § 9.16, p 278.

[26] *Martin I*, n 2 *supra*, p 713.

[27] *Conroy*, n 10 *supra*, pp 361-366.

[28] Meisel, n 4 *supra*, § 9.10, p 269.

conditions applicable.[29] Courts have attached differing meanings to terms such as "clear and convincing"[30] or "substituted judgment."[31] But most courts to address this issue have permitted termination of life-sustaining medical treatment on the basis of an objective test, or at least a more lenient subjective standard than the one required by the majority.[32] These cases typically seek to respect the patient's wishes whenever they can be determined without "foreclos[ing] the possibility of humane actions, which may involve termination of life-sustaining treatment, for persons who never

---

[29] Only New York and Missouri courts have imposed such a rigid standard. *In re Westchester,* n 20 *supra,* pp 530-531; *Cruzan v Harmon,* 760 SW2d 408, 425 (Mo, 1988), aff'd *Cruzan v Director,* n 20 *supra.* See also *DeGrella v Elston,* stating:

> In all but two states, Missouri and New York, even when the court has been unable to precisely determine the express wishes of the patient, it has allowed the patient's family, or the patient's guardian, to exercise substituted judgment as to what the patient would wish. [858 SW2d 698, 706 (Ky, 1993).]

[30] See n 5.

[31] The majority describes the "substituted judgment" standard as "entail[ing] some level of objective analysis" because it allows the decisionmaker to consider a broad range of factors, including the patient's personal values and other behavior, to determine what the patient "would choose." *Ante,* pp 219-221.

Some courts appear to have allowed the decisionmaker actually to substitute his own judgment for the wishes of the incompetent patient. See, e.g., *In re Torres,* 357 NW2d 332, 341 (Minn, 1984). But properly applied, the substituted judgment standard closely resembles a subjective inquiry with a burden of proof lower than "clear and convincing evidence." It "attempt[s] to replicate what the patient would have decided if competent to do so." Meisel, n 4 *supra,* § 9.10, p 270.

[32] Most courts have ruled that even where a patient has not expressly stated wishes regarding life-sustaining medical treatment, a substituted judgment standard is used to determine "what decision the patient would make if he were competent to do so." *In re Longeway Estate,* 133 Ill 2d 33, 49; 549 NE2d 292 (1989). See also *Guardianship of Doe,* 411 Mass 512, 517-518; 583 NE2d 1263 (1992); *Browning,* n 18 *supra,* p 13. A smaller number of courts have employed a pure objective "best interests" standard. See, e.g., *Conroy,* n 10 *supra; Rasmussen v Fleming,* 154 Ariz 207, 221-222; 741 P2d 674 (1987).

clearly expressed their desires about life-sustain-
ing treatment . . . ."[33]


### A


The majority first chooses to apply only a purely
subjective inquiry in this case. It notes that "the
evidentiary and decision-making standards appro-
priate in a given case do not depend on the source
of the right;"[34] yet its analysis rests on its choice of
informed consent as the sole basis for the right to
refuse life-sustaining medical treatment in this
case. The majority rightly points out that the
substituted judgment standard, and especially the
best interests standard, "entail[] some level of
objective analysis."[35] But this has not constrained
other courts to look solely at the patient's prior
expressed wishes. Instead, courts have employed
their parens patriae authority to allow surrogate
decision making with both objective and subjective
inquiries.[36]

But with little discussion, the majority declines
to make use of its parens patriae power.[37] The
majority claims that cases adopting an approach
with objective elements have generally involved
patients in circumstances different than Michael
Martin.[38] The majority offers no convincing expla-

[33] *Conroy,* n 10 *supra,* p 364.

[34] *Ante,* p 216. See also Meisel, n 4 *supra,* § 3.4, p 50.

[35] *Ante,* p 220.

[36] See, e.g., *Longeway,* n 32 *supra,* pp 52-53; *Conroy,* n 10 *supra,* p 364.

[37] It states simply that "we find nothing that prevents the state from grounding any objective analysis on a threshold requirement of pain, terminal illness, foreseeable death, a persistent vegetative state, or affliction of a similar genre." *Ante,* pp 222-223.

[38] *Id.* The majority, however, fails to cite any factually similar cases in which courts have *refused* to go beyond the subjective inquiry. In *Browning,* n 18 *supra,* p 13, the Florida Supreme Court espoused a substituted judgment standard where the patient was in a condition

nation why Michael Martin's condition must be treated differently.[39]

Implicit in the majority's refusal to inquire into those benefits and burdens seems to be a judgment that the costs of not making that inquiry are less than for patients in other circumstances. The majority seems to assume that life in Michael Martin's situation is somehow more tolerable for him. This suspicion is heightened by the majority's suggestion that an objective inquiry into Michael Martin's best interests would support maintaining him on life-sustaining medical treatment.[40] This conclusion, however, is flatly contradicted by the court-appointed guardian ad litem, who concluded that removing life-sustaining medical treatment would be in Michael's best interests.

**B**

After limiting the inquiry to the patient's prior expressed wishes, the majority compounds its error by imposing a heightened standard of proof. The majority recognizes the principle that "a decision to refuse medical treatment in future situations, made while competent, is not lost because of incompetency or the inability to communicate."[41] Yet its "clear and convincing" burden of proof will have that effect in many cases, including this one.[42]

---

similar to Michael Martin's and had executed a prior directive that only arguably addressed her current condition.

[39] For example, the majority notes that courts have used objective inquiries where a patient was never competent. *Ante,* p 223. But as one commentator notes, "decisionmaking for never-competent patients is merely a variant of the larger problem of decisionmaking for patients whose preferences are unknown and unknowable." Meisel, n 4 *supra,* § 9.14, p 275.

[40] *Ante,* p 223, n 16.

[41] *Ante,* p 217.

[42] The majority tries to limit its ruling to the facts of this emotionally difficult case. See, e.g., *id.,* p 223, n 15. But trial courts and the

As one court has recently noted, the patient's "right to self determination would not be protected, but rather, might well be negated" if life-sustaining medical treatment withdrawal were forbidden absent clear and convincing evidence of a patient's prior expressed wishes addressed to the current condition.[43] Under the majority's approach, courts inevitably will reject trustworthy evidence concerning a patient's prior wishes on the ground that it fails to meet the clear and convincing evidence standard. As one commentator stated, "those few states that require a 'clear and convincing' standard of evidence will likely fail to honor an incompetent patient's desires."[44]

V

The majority characterizes its ruling as a cautious approach to a life-or-death decision.[45] It suggests that " '[a]n erroneous decision not to terminate [life-sustaining medical treatment] results in a maintenance of the status quo' " and that such an error can be corrected in the future.[46] But keeping Michael Martin alive is not the neutral, safe solution. As Justice Brennan stated in *Cruzan*,

> from the point of view of the patient, an erroneous decision in either direction is irrevocable. An erroneous decision to terminate artificial nutrition and hydration, to be sure, will lead to . . . complete brain death. An erroneous decision not to terminate life support, however, robs a patient of the very qualities protected by the right to avoid unwanted medical treatment. His own degraded existence is perpetuated; his family's suffering is pro-

Court of Appeals will follow this Court's lead in other cases involving very different facts.

[43] *Fiori,* n 12 *supra,* p 623.

[44] See Beebe, n 5 *supra,* p 665.

[45] *Ante,* pp 224-225.

[46] *Id.,* p 226.

tracted; the memory he leaves behind becomes
more and more distorted.[47]


The majority's tightly constricted inquiry
greatly increases this risk. In this case, it has
sentenced Michael Martin to life in a helpless,
degraded condition against his prior wishes. To
quote the majority's own opinion, "to condemn
persons to lives from which they cry out for re-
lease is nothing short of barbaric."[48]

[47] *Cruzan v Director,* n 20 *supra,* p 320 (Brennan, J., dissenting).
[48] *Ante,* p 208.