# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ESTATE OF LINDA L. DALPE.

ANTHONY PASSARELLI,

        Petitioner-Appellant,

v

KATHY J. MANNERS, Personal Representative of
the ESTATE OF LINDA L. DALPE,

        Respondent-Appellee.

UNPUBLISHED
October 9, 2018

No.   339899
Alcona Probate Court
LC No.   16-005565-DE

Before:  MURPHY, P.J., and SAWYER and SWARTZLE, JJ.

PER CURIAM.

Petitioner, Anthony Passarelli, appeals by right the probate court's order denying his motion to admit an unsigned will as the will of decedent, Linda Dalpe.  We affirm.

## I. BACKGROUND

Alan Kew, now deceased, was involved in a romantic relationship with Dalpe.  Kew had two stepchildren, petitioner and Marie Passarelli, from a prior marriage.  Dalpe was not related to petitioner.  Respondent, Kathy Manners, is Dalpe's sister.  Under the terms of the unsigned will, Kew's stepchildren would receive Dalpe's estate, which consisted primarily of assets left to her by Kew.  Dalpe did not have another will and, if the unsigned will was not admitted, her estate would pass through intestate succession.

Petitioner filed a motion to accept the unsigned will and the probate court held a hearing on the motion.  At this hearing, petitioner presented evidence from William S. Smigelski, an attorney with whom Kew and Dalpe met prior to their deaths.  According to Smigelski, Kew and Dalpe were considering marriage, and Kew wanted to update his will.  After they discussed their concerns and desires with Smigelski, he and his partner created a complex estate plan for Kew. Kew was dissatisfied with the plan's complexity, however, and wanted more time to consider it. As an interim measure, Smigelski created a simple will that provided for all of Kew's assets to go to Dalpe in the event of his death; if Dalpe predeceased Kew, his assets would go to his two stepchildren, petitioner and Marie.  Kew died on October 26, 2015, shortly after meeting with

-1-

Smigelski and before making a decision on the complex estate plan. As a result, his estate went to Dalpe.

Smigelski testified that, after Kew's death, he met twice with Dalpe to discuss both her estate plan and the processing of Kew's estate. According to Smigelski, Dalpe expressed her desire for her entire estate to be given to the stepchildren to share. Smigelski testified that Dalpe's wishes were so similar to Kew's that Smigelski took a copy of Kew's will and made handwritten notes on it to indicate the specific changes Dalpe wanted to make. If one of the stepchildren predeceased the other, that share was to pass to the other survivor. If neither beneficiary survived her, the estate was to go to Jennifer Memerski, Kew's step-granddaughter. Petitioner was to be her personal representative with Marie as the alternative. Finally, there was to be a durable power of attorney and patient advocate given to respondent.

Following the second meeting, Smigelski drafted a will, durable power of attorney, and patient advocate. Smigelski, however, did not see Dalpe again after the second meeting. Although Smigelski testified that Dalpe never contacted him after this meeting to express that she did not want the stepchildren to be beneficiaries of her estate, he also stated that Dalpe never saw the completed draft will and may not have seen the rough draft he created at the meetings. Dalpe died approximately one month after the second meeting.

Respondent disputed Smigelski's testimony about his various meetings with Dalpe. Respondent testified that she was at these meetings and that there was no discussion about Dalpe's estate or her will. Respondent also did not recall Smigelski creating a rough draft with handwritten notes at the meetings. According to respondent, these meetings involved only the processing of Kew's estate; there were no discussions about Dalpe's estate.

Furthermore, respondent testified that Dalpe's relationship with the stepchildren had soured near the end of Dalpe's life and that Dalpe would never have made them beneficiaries of her estate. She described an argument between Dalpe and the stepchildren that had occurred in Dalpe's home sometime after Kew's death. There was paperwork on the kitchen table, and the stepchildren may have been pressuring Dalpe into signing specific documents. Respondent was unsure what these documents were. Dalpe stated that she would not sign anything, threw the stepchildren out of her home, and had no further contact with them. Respondent testified that Dalpe "absolutely was not going to leave anything to" the stepchildren. According to respondent, Dalpe told her this on three separate occasions.

Respondent further testified that she and Dalpe both visited Smigelski's office on one more occasion after the second meeting and met with Smigelski's secretary concerning paperwork for Kew's estate. According to respondent, this secretary never informed them about the draft will or the need for Dalpe to review and sign it; in fact, they never even addressed or discussed it. Moreover, respondent testified that she and Dalpe visited Alpena, which Smigelski's office was evidently near, approximately 10 times after the second meeting, yet Dalpe never directed respondent to take her to Smigelski's office so that she could sign the formal will.

After hearing the evidence, the probate court denied petitioner's motion, finding that petitioner had failed to show by clear and convincing evidence that Dalpe intended for the draft

will to constitute her actual will. Although the probate court credited Smigelski's testimony concerning the two meetings, the probate court concluded that Dalpe's statements to respondent and the fact that Dalpe never signed the draft document created a serious question on whether the draft was actually reflective of Dalpe's testamentary intent. The probate court subsequently denied petitioner's motion for reconsideration.

This appeal followed.

## II. ANALYSIS

We review the probate court's factual findings for clear error. *In re Bennett Estate*, 255 Mich App 545, 549; 662 NW2d 772 (2003). "A finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *Id*.

Under the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.*, to be valid, a will generally must be (a) in writing; (b) signed by the testator or by someone at the testator's direction; and (c) signed by at least two witnesses within a reasonable time after witnessing the testator either sign the will, acknowledge the will's signature, or acknowledge the will itself. MCL 700.2502(1)(a)-(c). There is an exception, however, listed in MCL 700.2503, which provides, in pertinent part:

> Although a document or writing added upon a document was not executed in compliance with section 2502, the document or writing is treated as if it had been executed in compliance with that section if the proponent of the document or writing establishes by clear and convincing evidence that the decedent intended the document or writing to constitute any of the following:

> (a) The decedent's will.

This provision "permits the probate court to admit a will without a signature to probate if the proponent of the document in question establishes, by clear and convincing evidence, that the decedent intended the document to constitute his or her will." *In re Attia Estate*, 317 Mich App 705, 713; 895 NW2d 564 (2016). Evidence is clear and convincing if it "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995) (cleaned up). This evidence must be "so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Id*. (cleaned up).

Respondent disputed what occurred at the meetings between Smigelski and Dalpe. According to respondent, these meetings involved processing Kew's estate; Dalpe's estate was never discussed. The probate court found that Smigelski did discuss the will with Dalpe at the meetings and did make the handwritten notes. The probate court indicated that it did not doubt Smigelski's veracity, given that he was a longstanding and respected member of the legal community. The probate court found, however, that there were "clearly misunderstandings" by both Dalpe and respondent. Respondent had testified that neither she nor her sister was "very

-3-

savvy," and the probate court had "the impression from [respondent's] testimony that she probably wasn't really clear as to what all went on at" the meetings. This finding was well supported by the evidence. Respondent testified that she did not know what exactly an estate plan was. She also testified that at the meetings "some other words that I didn't know" were used that she figured would be clarified later on if needed. Respondent also testified that Dalpe had only a ninth-grade education and was not well-versed "on a lot of stuff." She further testified that there was simply "no way" that Dalpe could have contacted an attorney and "asked for stuff to be done."

Moreover, respondent presented other testimony that cast doubt on Dalpe's intentions. It was undisputed that Dalpe had an argument with the stepchildren and explicitly stated to respondent that she would not sign anything. Dalpe threw the stepchildren out of her house and had no further contact with them. Respondent also testified that Dalpe "absolutely was not going to leave anything to" the stepchildren and that Dalpe told her this on at least three occasions. This testimony could be (and was) credited by the probate court as an exception to the hearsay rule under MRE 803(3). See *Aetna Life Ins Co v Brooks*, 96 Mich App 310, 313; 292 NW2d 532 (1980).

Furthermore, it was undisputed that respondent and Dalpe were very close. Respondent testified that her relationship with Dalpe had been very good. The two were always together and knew quite a bit about each other. After Kew's death, Dalpe and respondent lived together, and respondent also took care of Dalpe's transportation needs.

Additionally, both respondent and Smigelski testified that Dalpe never saw the completed draft, and Smigelski testified that he believed Dalpe had not even seen the initial rough draft. Dalpe never reviewed the completed draft with Smigelski to confirm that it represented her full and complete testamentary intent. In fact, there was doubt over whether she even knew that it existed.

Respondent also testified that she did not recall discussing the draft will with Smigelski when Dalpe was hospitalized. She stated that she had no reason to have discussed such a topic with him given that she believed Dalpe would make a full recovery. Finally, respondent testified that she did not know who the alleged beneficiary Jennifer Memerski was, that she did not believe Dalpe had ever had contact with Memerski, and that she did not believe her sister would sign over assets to a beneficiary she did not know. Because no testimony was elicited from Smigelski concerning this, the probate court found it to be "another question thrown into the mix." Respondent also believed that Dalpe would want respondent to be her personal representative, not petitioner.

We must give deference to the "the special opportunity of the trial court to judge the credibility of those witnesses who appeared before it." *Detroit Bank & Trust Co v Grout*, 95 Mich App 253, 268; 289 NW2d 898 (1980) (cleaned up). In light of the conflicting testimony, we conclude that the probate court did not clearly err by determining that petitioner failed to establish, "by clear and convincing evidence, that the decedent intended the document to constitute . . . her will." *In re Attia Estate*, 317 Mich App at 713. The evidence was not so strong as to establish a firm conviction that the unsigned draft will was evidence of Dalpe's testamentary intent. *In re Martin*, 450 Mich at 227.

Affirmed.

/s/ William B. Murphy
/s/ David H. Sawyer
/s/ Brock A. Swartzle