WERTH v TAYLOR

Docket No. 123785. Submitted January 16, 1991, at Lansing. Decided July 8, 1991, at 9:05 A.M.

Cindy K. Werth and Donald E. Werth, members of Jehovah's Witnesses, brought an action in the Alpena Circuit Court against Michael V. Taylor, M.D., and others after Cindy Werth's hospitalization for childbirth and subsequent surgery for dilatation of the cervix and curettage of the uterine lining to stem postpartum hemorrhaging, alleging that Taylor committed a battery in authorizing what he believed to be a lifesaving blood transfusion during the D & C procedure in spite of the plaintiffs' prior written and oral refusal to permit blood transfusions on religious grounds. The court, Joseph P. Swallow, J., granted summary disposition for the defendant. The plaintiffs appealed.

The Court of Appeals *held:*

Consent to medical treatment may be implied where an emergency procedure is necessary to preserve the patient's life and there is no opportunity to obtain actual consent. Only the patient's fully informed, contemporaneous refusal is sufficient to override evidence of medical necessity.

In this case, the patient's prior refusals were not contemporaneous or informed because they were made before the necessity for the transfusion arose and in contemplation of a routine D & C without life-threatening complications.

Affirmed.

*Sommers, Schwartz, Silver & Schwartz, P.C.* (by *Stanley S. Schwartz* and *Richard L. Groffsky*), for the plaintiffs.

*Stroup, Johnson & Tresidder, P.C.* (by *Charles W. Johnson*), for Michael V. Taylor, M.D.

Before: NEFF, P.J., and SHEPHERD and McDONALD, JJ.

NEFF, P.J. Plaintiffs, Cindy K. Werth and Don-

ald E. Werth, appeal as of right from an order of the circuit court granting summary disposition pursuant to MCR 2.116(C)(10) in favor of defendant, Michael V. Taylor, M.D. We affirm.

I

Plaintiffs filed a civil battery claim against defendant Taylor based on his authorization of a blood transfusion for Cindy Werth despite plaintiffs' refusals. Plaintiffs also filed a medical malpractice claim against Taylor and other defendants. The medical malpractice claim is not the subject of this appeal.

The facts are not in dispute. Cindy and her husband Donald are Jehovah's Witnesses. It is unquestioned that they are both devoted adherents to the tenets of their chosen faith. According to Cindy Werth's deposition testimony, one of the most deeply held of these tenets is the belief that it is a sin to receive blood transfusions.

In August 1985, Cindy, the mother of two children, became pregnant with twins. About two months before the expected date of delivery, Cindy went to Alpena General Hospital to preregister. She filled out several forms, including a "Refusal to Permit Blood Transfusion" form. Cindy went into labor on May 8, 1986, and entered Alpena General Hospital on that date. While she was being admitted, Donald signed another "Refusal to Permit Blood Transfusion" form.

Cindy gave birth to her twins on the evening of May 8, 1986. Following delivery, Cindy was found to be bleeding from her uterus. Around 11:30 P.M., Dr. Cheryl Parsons was called. She performed a pelvic examination and discovered a great deal of clotting and a fair amount of bleeding. Dr. Parsons

then discussed performing a dilation of the cervix and curettage of the uterine lining (D & C). As a result, Dr. Parsons began discussing with plaintiffs their refusals of blood transfusions.

Following this discussion, Cindy was taken to surgery. In the early hours of May 9, 1986, she was placed under general anesthesia, and Dr. Parsons proceeded to perform a D & C. The bleeding, however, continued. Defendant Taylor, an anesthesiologist, was then called to the hospital to examine Cindy. Cindy's blood pressure had risen significantly. At approximately 1:30 A.M., defendant Taylor observed mottling and cooling of the skin peripherally, premature ventricular activity, oozing of crystalloid material from her eyes, and a fairly rapid and significant fall in blood pressure. These observations prompted defendant Taylor to determine that a blood transfusion was medically necessary to preserve Cindy's life. He ordered the transfusion of packed red blood cells, but before the transfusion was given, Dr. Parsons informed him that Cindy was a Jehovah's Witness. Dr. Parsons testified that defendant responded by saying something like "that may be, but she needs the blood." A blood transfusion was then given.

Plaintiffs thereafter filed their medical malpractice action, alleging negligence by various defendants, including Taylor, and alleging battery against defendant Taylor.

Defendant Taylor filed a motion for summary disposition pursuant to MCR 2.116(C)(10), arguing that because Cindy's refusal was not conscious, competent, contemporaneous, and fully informed, defendant did not commit a battery in deciding to infuse blood. The trial court granted this motion and entered an order dismissing plaintiffs' claim against defendant Taylor.

II

Plaintiffs contend that the trial court erred in granting summary disposition where their refusal of a blood transfusion was made deliberately and voluntarily. They also contend that defendant's decision to perform that procedure with knowledge of this express refusal resulted in a battery, as well as a violation of the hospital's promise to honor plaintiffs' religious convictions, and that the potentially life-threatening situation did not alter plaintiffs' conscious, deliberate, and unequivocal refusal. Plaintiffs also claim that the court erred in holding that society's interest in preventing minors from becoming wards of the court could override plaintiffs' religious beliefs.

Defendant Taylor, on the other hand, contends that the trial court did not err in granting summary disposition, because plaintiffs did not unequivocally refuse the blood transfusion. He claims that, in the face of a life-threatening emergency, without a fully conscious and contemporaneous refusal, his decision to transfuse blood was appropriate and the court did not err in finding an implicit consent to the procedure authorized by him. Defendant Taylor also contends that the state's interest in preserving life authorized him to override plaintiffs' right to refuse blood transfusions on religious grounds. He claims that, while a patient may knowingly decline treatment, the patient has no right to demand inadequate treatment, and the courts will not require that such be committed.

III

Summary disposition based on MCR 2.116(C)(10) may be granted where, except for the amount of damages, there is no genuine issue regarding any

material fact and the moving party is entitled to judgment as a matter of law.

A motion for summary disposition under this subrule tests whether there is factual support for a claim. *Dumas v Auto Club Ins Ass'n,* 168 Mich App 619, 626; 425 NW2d 480 (1988). The party opposing the motion has the burden of showing that a genuine issue of disputed fact exists. *Pantely v Garris, Garris & Garris, PC,* 180 Mich App 768, 773; 447 NW2d 864 (1989). Giving the benefit of any reasonable doubt to the nonmovant, the court must determine whether a record might be developed which will leave open an issue upon which reasonable minds could differ. *Dumas, supra.* All inferences are to be drawn in favor of the nonmovant. *Dagen v Hastings Mutual Ins Co,* 166 Mich App 225, 229; 420 NW2d 111 (1987). Before judgment may be granted, the court must be satisfied that it is impossible for the claim asserted to be supported by evidence at trial. *Peterfish v Frantz,* 168 Mich App 43, 48-49; 424 NW2d 25 (1988).

## A

A competent adult patient has the right to decline any and all forms of medical intervention, including lifesaving or life-prolonging treatment. *Cruzan v Director, Missouri Dep't of Health,* —US —; 110 S Ct 2841; 111 L Ed 2d 224 (1990); *In re Quinlan,* 70 NJ 10; 355 A2d 647 (1976). See anno: *Patient's right to refuse treatment allegedly necessary to sustain life,* 93 ALR3d 67. Indeed, the whole concept of informed consent to treatment leads to an inference of its converse—informed refusal of treatment. Put another way, a competent adult may choose to give or withhold consent to medical treatment.

However, the law implies the consent of an unconscious patient to medical procedures needed to preserve the patient's life. *Delahunt v Finton,* 244 Mich 226, 229; 221 NW 168 (1928). See also *Young v Oakland Gen Hosp,* 175 Mich App 132, 139; 437 NW2d 321 (1989). If a physician treats or operates on a patient without consent, he has committed an assault and battery and may be required to respond in damages. *Id.; Banks v Wittenberg,* 82 Mich App 274, 279; 266 NW2d 788 (1978). Consent may be expressed or implied. *Young, supra; Banks, supra,* p 280. It has been held that consent is implied where an emergency procedure is required and there is no opportunity to obtain actual consent or where the patient seeks treatment or otherwise manifests a willingness to submit to a particular treatment. *Young, supra; Banks, supra.*

**B**

Here, the trial court determined that Cindy's refusals were made when she was contemplating merely routine elective surgery and not when life-threatening circumstances were present and concluded that it could not be said that she made the decision to refuse a blood transfusion while in a competent state and while fully aware that death would result from such refusal. The record reflects the unexpected development of a medical emergency requiring blood transfusion to prevent death or serious compromise of the patient's well-being.

The decision of the trial court is supported by one reached by the Supreme Court of Pennsylvania in *In re Estate of Dorone,* 517 Pa 3; 534 A2d 452 (1987). In *Dorone,* the patient was a twenty-two-year-old Jehovah's Witness who required a blood transfusion during a cranial operation to

relieve an acute subdural hematoma. Without the operation or transfusion, death was imminent. The patient was unconscious, and his parents refused consent to the blood transfusion. The court overruled the parents' refusal, stating:

> Turning to the ultimate decisions the judge rendered, we feel that they were absolutely required under the facts he had before him. Those facts established that medical intervention, which necessarily included blood transfusions, could preserve Mr. Dorone's life. When evidence of this nature is measured against third party speculation as to what an unconscious patient would want there can be no doubt that medical intervention is required. Indeed, in a situation like the present, where there is an emergency calling for an immediate decision, nothing less than a fully conscious contemporaneous decision *by the patient* will be sufficient to override evidence of medical necessity. [*Id.*, p 9.]

Here, both plaintiffs signed "Refusal to Permit Blood Transfusion" forms. Following Cindy's delivery of twins, Dr. Parsons discussed these refusals with both plaintiffs. Cindy recalled their conversation as follows:

> She—okay. We told her—she said, "I understand that you're one of Jehovah's Witnesses and that you won't take blood," and Don and I both said, "That's correct." And she said, "You mean to tell me if your wife's dying on the table that you're not going to give her blood?" And we said—Don said, "That's—well, I don't want her to have blood, but I don't want her to die. We want the alternative treatment."
>
> * * *
>
> She said there would be no problem. It was a routine D & C, there was no problem with the blood.

\*   \*   \*

The idea of a blood transfusion, she made it sound that it wouldn't even be a problem. Blood wouldn't come into the picture. That's how I understood it.

Donald also testified regarding the conversation as follows:

At the time of the consent form, she gave it to my wife and had her look it over and read it, and she said—she acknowledged us as being one of Jehovah's Witnesses, and then she said, "Would you accept blood?" And we replied, "No." And then she made the remark, "Even if she was to die, you'd let her die?"

And at that point, I questioned, I said, "Well, how serious of a, you know, condition was she?" And the reason why we asked that is because, like I say, in different situations like there are Witnesses who have gone to hospitals, you know, if there was some type of real emergency, a lot of times they're shipped out or flown out. Different ones have gone to Ann Arbor and other places.

So at that time, I was just kind of questioning, well, how serious was it, you know. First of all, you say it's a routine D & C; then you mention that if she was to die, and so that's why I questioned it, and then she reassured us that there was no problem, nothing to it.

The following colloquy then occurred between defense counsel and Donald:

*Q.* So you never answered the question.
*A.* Oh, as far as the idea of dying?
*Q.* Yes.
*A.* I said no. The answer was no.
*Q.* Even if she was to die, you said "No blood."
*A.* Right.
*Q.* What did your wife say to that?

*A.* Well, she was right there and that was her feeling also.

*Q.* But you didn't have the feeling that that was part of the problem or a possibility? It was kind of an academic discussion, that she might die?

*A.* Well, she said it in a joking manner. It wasn't done as a serious matter. Being with a joking manner, that's why I asked her how serious it was and then she just—"Oh, there's no problem."

*Q.* Okay. So you weren't really biting the bullet because it didn't seem to be part of the problem that she was going to die or there was a risk of her dying?

*A.* At that point, no.

Dr. Parsons testified to the conversation as follows:

I recall discussing with her and her husband the fact that they were Jehovah's Witnesses and that she indicated that this was true. And I said, "Is it true that you do not want any blood transfusions?" She said, "No." He looked at me and said, "Do you think it's that bad?" And I said, "Not right now." And I didn't get any further answer from him in terms of whether he felt that if it became that bad he might change his mind. And I left it at that.

She also described Donald's response as "wishy-washy."

Following this discussion, Cindy underwent surgery. She was placed under general anesthesia, and Dr. Parsons performed a D & C. Cindy did not regain consciousness again until after the operation and transfusion of blood were performed. Defendant Taylor testified that he was aware, before deciding to infuse blood, that Cindy was a Jehovah's Witness. No attempt was made to bring Cindy to consciousness in order to obtain her approval, and defendant Taylor testified that this

option was "foolhardy." No attempt was made to discuss his decision with Donald because defendant saw nothing to be gained from it. He did not believe Donald could give or deny permission for a blood transfusion.

C

We agree with the principle in *Dorone* that it is the patient's fully informed, contemporaneous decision which alone is sufficient to override evidence of medical necessity. The fact that defendant did not obtain the consent of Cindy's husband does not preclude the granting of summary disposition. It is undisputed that Cindy was unconscious when the critical decision regarding the blood transfusion to avoid her death was being made. Her prior refusals had not been made when her life was hanging in the balance or when it appeared that death might be a possibility if a transfusion were not given. Clearly, her refusals were, therefore, not contemporaneous or informed. Thus, a record could not be developed regarding Cindy's refusal which would leave open an issue upon which reasonable minds could differ.

Our holding in this case is narrow. Without contemporaneous refusal of treatment by a fully informed, competent adult patient, no action lies for battery and summary disposition was proper.

D

Because of our resolution of this case, we need not address the issue whether the trial court erred in holding that the state had a valid interest in preventing Cindy's death.

Affirmed.