*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re BELL, Minors.

FOR PUBLICATION
May 19, 2022
9:10 a.m.

No. 360191
Genesee Circuit Court
Family Division
LC No. 17-134650-NA

Before: GADOLA, P.J., and SERVITTO and REDFORD, JJ.

SERVITTO, J.

In this termination of parental rights matter, the minor child, through her Guardian Ad Litem (GAL), appeals by leave granted[1] the trial court order granting respondent-mother's motion for 12-year-old AB to undergo an independent medical examination (IME) to determine whether she has any physical signs of sexual abuse. We reverse and remand.

Respondents have seven minor children ranging in age from 14 to 4.[2] On June 5, 2021, Child Protective Services received a referral that respondents had physically abused the eldest child.[3] The children were removed from the home and were placed in foster care, and respondents were granted parenting time.

Five weeks after the children's removal, the court approved a petition from the Department of Health and Human Services (DHHS) for emergency psychiatric treatment for one of the minor children, AB. Due to AB's continued behavioral concerns, DHHS requested to place her in a residential treatment facility for therapy and an assessment of the severity of her mental health issues. The court also granted that request.

---

[1] *In re Bell*, unpublished order of the Court of Appeals, entered February 15, 2022 (Docket No. 360191).

[2] The issue on appeal pertains to only one of the minor children, AB.

[3] Respondents have four prior substantiated petitions for child abuse and neglect.

-1-

Thereafter, respondent-mother entered a plea by admission and respondent-father entered a no-contest plea to the order of adjudication. The court entered an order of disposition, directing anger management, substance abuse treatment for respondent-father, and mental health treatment for respondent-father and minor children. DHHS then sought termination because AB alleged that respondent-father had beaten and raped her several times. The petition also alleged that respondent-mother failed to protect AB after AB told her of the abuse.

On January 12, 2022, respondent-mother's counsel e-mailed opposing counsel to request that they stipulate to AB undergoing an IME to reveal any medical evidence of sexual abuse. Opposing counsel declined to stipulate to an IME. On January 17, 2022, respondent-mother filed an ex parte motion for an IME. She acknowledged that AB had alleged that respondent-father had raped her repeatedly since she was six years old and the abuse included vaginal penetration, but denied that AB had ever told her about the abuse. Respondent-mother stated that the allegation arose only after father told AB that her phone would not be returned given her behavioral issues while in foster care, and mother believed that AB made the allegation in retaliation.

On January 21, 2022, the trial court granted the ex parte motion. It directed that AB undergo an IME to determine if there was any physical evidence of sexual assault. The GAL immediately objected to the order, noting that respondent-mother did not comply with MCR 3.207. Further, the GAL argued that the order to undergo an IME was not in AB's best interests, particularly where the invasive IME would not be determinative of whether AB was assaulted before she was removed from respondents' care in June 2021.

DHHS also objected to the ex parte order, reiterating that respondent-mother had not followed the requirements in MCR 3.207, and she had failed to inform the court that she previously had sought concurrence from opposing counsel but it was denied. DHHS also contended that respondent-mother failed to show a legal basis to force a 12-year-old child to undergo an internal sexual assault IME and pointed to the policies relating to the rape shield laws to argue that an IME should not be performed absent consent. DHHS also provided an affidavit from therapist Paula Archambault, who has been qualified as an expert in child sexual abuse cases. Archambault stated that sexual abuse is rarely proven through medical examination of the genitalia, particularly after much time has passed. It was Archambault's understanding that AB did not wish to be subjected to an IME, and Archambault opined that a forced IME could be very detrimental to AB's mental health.

A hearing to address the objections to the ex parte order was held on January 25, 2022 and the trial court issued a written opinion and order on the matter on February 3, 2022. In its opinion and order, the court conceded that it should not have entered the order ex parte and instead should have set the matter for oral argument. It thus set aside its earlier ex parte order. However, analyzing the matter under a due process framework, the court then again granted the motion for an IME of AB to determine if there was physical evidence of a sexual assault. AB, through her GAL, filed an application for leave to appeal that ruling and this Court granted the application.[4]

---

[4] DHHS concurs with the GAL's position and has filed a brief in support.

Whether a respondent in a termination case was afforded due process is a question of law subject to a de novo standard of review. *In re Williams*, 333 Mich App 172, 178; 958 NW2d 629 (2020). This Court also reviews de novo the interpretation and application of statutes and court rules. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). If the trial court had discretionary authority to order a physical examination, this Court reviews the trial court's exercise of that discretion for an abuse of discretion. See *Burris v KAM Transp, Inc*, 301 Mich App 482, 487; 836 NW2d 727 (2013). An error of law by the trial court necessarily constitutes an abuse of discretion. *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 274; 884 NW2d 257 (2016).

This case presents a question which this Court has never had to address: does a trial court in a child protection proceeding have the authority to order a minor child alleging sexual assault to submit to a court-ordered forensic sexual assault examination? We find that it does not.

First and foremost, respondent-mother did not direct the trial court, nor does she direct this Court, to any viable legal basis for entry of the trial court's order. Respondent-mother has not provided authority to show that she has a right to request an IME, nor has she provided legal precedent for the trial court to order an IME in the context of a termination proceeding. In the absence of authority cited by respondent, she has not shown that she is entitled to a court-ordered IME of AB.

While respondent-mother cites MCR 2.311 as allowing for an order for examination, respondent-mother likewise acknowledges that MCR 2.311 is a rule of civil procedure—not a rule applicable to child protective proceedings.[5] Respondent-mother appears to assert, without authority, that when an issue arises in a child protective proceeding that is not specifically addressed in the rules governing such proceedings, by default, the rules of civil procedure apply. "A party may not merely announce a position and leave it to this Court to discover and rationalize the basis for the claim." *Nat'l Waterworks, Inc. v Int'l Fidelity & Surety, Ltd*, 275 Mich App 256, 265; 739 NW2d 121 (2007).

In addition, MCR 2.311(A) permits a trial court to order a party to undergo a physical examination, with good cause shown, when a party puts his or her physical condition "in controversy." This court rule typically applies to insurance claims, medical-malpractice cases, and tort actions in which the plaintiff seeks damages for a claimed injury. See, e.g., *Schaumann-Beltran v Gemmete*, 335 Mich App 41, 44, 47-48; 966 NW2d 172 (2020), rev'd on other grounds, __ Mich__, __NW2d __(2022) (applying MCR 2.311(A) in medical-malpractice suit); *Burris*, 301 Mich App at 487-488 (applying MCR 2.311(A) in personal-injury suit). By alleging sexual assault, however, a complainant does not put his or her physical condition at issue like a plaintiff alleging physical injury in a tort suit. This is particularly true in the context of a child-protective proceeding, where the minor child has no choice regarding whether DHHS initiates proceedings against the child's parent. Respondent-mother has not shown that AB's physical condition is in

---

[5] Child protective proceedings are governed by MCR 3.900 *et seq*.

controversy.[6] What *is* in controversy with respect to AB and respondent-mother is whether AB told respondent-mother that respondent-father had sexually abused AB and whether respondent-mother took any action to protect AB. Any purported injury that would be discoverable through a forensic sexual assault examination is not in controversy, and a complainant's disclosure of sexual assault does not make it so. Reading MCR 2.311(A) to authorize the trial court's unprecedented order expands the court rule well beyond its bounds.

As no court rule or statutory authority directly provides for the order entered by the trial court in the case, AB argues that statutory provisions in criminal cases provide support for her position that the trial court erred by ordering AB to undergo an IME. Although this case involves child-protective proceedings, and termination proceedings are not criminal in nature, *In re Richardson*, 329 Mich App 232, 254; 961 NW2d 499 (2019), we find provisions in the criminal code persuasive to the question at issue in this case.

AB focuses heavily on MCL 333.21527(1), which prescribes the following procedures for health care professionals to administer sexual assault examinations:

> If an individual alleges to a physician or other member of the attending or admitting staff of a hospital that *within the preceding 120 hours* the individual has been the victim of criminal sexual conduct . . . , the attending health care personnel responsible for examining or treating the individual immediately shall inform the individual of the availability of a sexual assault medical forensic examination, including the administration of a sexual assault evidence kit. *If consented to by the individual*, the attending health care personnel shall perform or have performed on the individual the sexual assault medical forensic examination, including the procedures required by the sexual assault evidence kit. [Emphasis added.]

Importantly, MCL 333.21527(1) applies only to allegations of criminal sexual conduct (CSC) occurring within the preceding 120 hours and provides for a sexual assault examination to be performed only with the consent of the complainant. Of course, the statute plainly does not apply here as AB did not allege to a physician that she was the victim of CSC. However, the statute's 120-hour requirement and the need for consent are of particular relevance in this case. AB, and the rest of the Bell children, were removed from their parents' custody on June 6, 2021, so the last possible act of sexual abuse alleged by AB would have occurred at least 10 months ago. And, as is clear from the fact of this appeal, AB does not consent to the requested IME. The fact that MCL 333.21527(1) requires health care professionals to inform a patient who has alleged sexual assault within the preceding 120 hours of the availability of a forensic examination, and allows the examination only with consent of the individual, further highlights the trial court's lack of authority to order an IME of AB against her consent and so far removed from the time of the alleged assault.

Additionally, in CSC cases, statutory law substantially limits a criminal defendant's ability to introduce evidence of the victim's history of sexual conduct. Known as the rape-shield statute,

---

[6] This is assuming, without deciding, that AB is arguably even a "party" to whom MCR 2.311(A) would apply; AB is listed as an appellant before this Court, but is not a "party" in the lower court termination proceeding.

MCL 750.520j reflects a legislative conclusion that evidence of a complainant's sexual history with individuals other than the defendant is generally "legally irrelevant and inadmissible as a matter of law." *People v Adair*, 452 Mich 473, 480-481; 550 NW2d 505 (1996). More importantly, it removes unnecessary deterrents to the reporting and prosecution of crimes. *People v Arenda*, 416 Mich 1, 10; 330 NW2d 814 (1982). Given the extra vulnerabilities of minors in child-protective proceedings, this Court will not create any additional barriers to the disclosure by children of sexual abuse by allowing court-ordered sexual assault examinations, particularly where the Legislature has given no indication that trial courts possess such authority and, as will be later discussed, due process does not require it.

MCL 776.21 is another persuasive indicator that the trial court lacked authority to order AB to undergo an IME. MCL 776.21(2) prohibits a police officer from requesting or ordering a victim of CSC to submit to a polygraph examination, except when the victim inquires about taking such a test. Therefore, Michigan law already protects complainants of sexual assault from police officers forcing them to submit to a polygraph examination. Given that a polygraph examination is a much less invasive procedure than an IME, it is unlikely that, without explicit statutory authority, the trial court possessed the authority to compel a sexual abuse complainant to undergo an IME.[7]

Even if this Court concluded that trial courts in child-protective proceedings possess some authority to order physical examinations of sexual abuse victims, an examination in this case is not warranted. A court is limited in child protection proceedings "in that it can only act after it has jurisdiction over a child, and it may only act to ensure a child's well-being." *In re Macomber*, 436 Mich 386, 398–99; 461 NW2d 671 (1990). The trial court's analysis of the issue under due process was incomplete, erroneously determined that the factors set forth in *Mathews v Eldridge*, 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976) favored ordering the IME, and failed to ensure AB's well-being.

"Parents possess a fundamental interest in the companionship, custody, care, and management of their children, an element of liberty protected by the due process provisions in the federal and state Constitutions." *In re Yarbrough Minors*, 314 Mich App 111, 122; 885 NW2d 878 (2016), citing US Const, Am XIV; Const 1963, art 1, § 17. However, this fundamental right is not absolute, as the state has a legitimate interest in safeguarding the health and welfare of children. *In re Sanders*, 495 Mich 394, 409-410; 852 NW2d 524, 532 (2014). In balancing these interests, and in determining what process the state owes parents in a child-protective proceeding, Michigan courts have followed the United States Supreme Court's test set forth in *Eldridge*, 424 US at 335. See *Sanders*, 495 Mich at 410. The *Eldridge* Court outlined three factors that must be balanced against one another to decide whether an individual was afforded due process:

> First, the private interest that will be affected by the official action; second, the risk
> of an erroneous deprivation of such interest through the procedures used, and the

---

[7] Also, given that criminal defendants generally receive greater constitutional protections than respondents in child-protective proceedings—proof beyond a reasonable doubt versus clear and convincing evidence, as one example—it would be inconsistent to allow a compelled IME of a sexual assault complainant in a parental rights case but not in a criminal case.

probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [*Eldridge*, 424 US at 335.]

"In essence, the *Eldridge* test balances the costs of certain procedural safeguards . . . against the risks of not adopting such procedures." *Sanders*, 495 Mich at 411.

Beginning with the first factor, the private interest affected by the official action, the trial court stated that it must balance respondent-mother's request for the IME against the effect of the IME on AB. The trial court subsequently stated, without explanation, that this factor weighed in favor of granting respondent-mother's motion. While respondent-mother's fundamental right to the care, custody, and control of her children is undoubtedly strong, AB's interest in her own general welfare, which includes her interests in privacy and bodily autonomy are *at least* as strong. After all, "[t]he substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable governmental interference." *Mays v Snyder*, 323 Mich App 1, 58–59; 916 NW2d 227 (2018). Moreover, the decision regarding whether to order an IME of AB will have minimal impact on the ultimate ruling as to whether respondent-mother's rights will be terminated; the issues leading to the trial court taking jurisdiction over the minor children involved far more than the asserted sexual assaults. In other words, whether or not AB is forced to undergo an IME will have little to no effect on respondent-mother's interest in the care and custody of her children.

On the other hand, ordering AB to undergo an IME is *guaranteed* to encroach upon AB's interests in privacy and bodily autonomy.[8] The trial court failed to explicitly address these considerations. The trial court also appeared to give minimal weight or consideration to AB's welfare and the psychological effect that a forced forensic sexual assault examination could have on her.[9] The importance of considering the mental health effect of a forced sexual assault examination is particularly salient in AB's circumstances, as the record clearly indicates that she is a child struggling with numerous mental health and psychological challenges.[10] Therapist Paula

---

[8] Throughout the briefing, the parties engage in a rhetorical back-and-forth regarding how to characterize the invasiveness of the requested IME. We take no position on the comparisons that the parties use, other than to point out that medical examinations or procedures traditionally require the consent of the patient. See *Werth v Taylor*, 190 Mich App 141, 145-146; 475 NW2d 426 (1991).

[9] The tone of respondent-mother's responsive brief on appeal is notable. Respondent-mother accuses the GAL and DHHS of "sexualizing" the IME. Considering that the sole reason for the IME is to determine whether AB's genitals reflect evidence of sexual abuse, it is disingenuous to characterize those opposing the IME as sexualizing it. Unfortunately, respondent-mother's pleadings also reflect her attempt to minimize the effect of the IME on her minor daughter.

[10] As recently as February 14, 2022, the trial court granted a request from DHHS to place AB in a qualified residential treatment facility and the court was well-aware of AB's mental health difficulties at the time it ordered the IME.

Archambault also opined that an unwanted medical examination of the type ordered by the court could have detrimental effects on a child's mental health and could lead to long-lasting psychological trauma for AB. Given the above, this Court finds that the requested IME impacts the private interests of AB significantly more than those of respondent-mother, and, consequently, the first *Eldridge* factor weighs against ordering the examination.

We next find that the second *Eldridge* factor—the risk of erroneous deprivation of the interest through the procedure—is very minimal. Any evidentiary value derived from the IME is unlikely because so much time has passed since AB was removed from respondent-father's custody. And regardless of the examining physician's findings, they will not be determinative as to whether AB was actually sexually assaulted.[11] Moreover, the specific allegation against respondent-mother by AB is that she did nothing to protect AB after AB disclosed that respondent-father had been sexually assaulting her. It is highly unlikely that an IME of AB will definitively resolve the question of whether AB was sexually assaulted and even less likely that the results of an IME would resolve whether AB in fact told respondent-mother about any assault.

Additionally, respondent-mother remains entitled to a termination trial at which the court must find clear and convincing legally admissible evidence of statutory grounds that justify the termination of respondent-mother's parental rights. See MCL 712A.19b(3). At her termination trial, respondent-mother will have an opportunity to challenge the evidence presented by DHHS, including cross-examining AB if she testifies. Respondent-mother will also be able to introduce evidence to rebut the allegations against her. It is thus highly doubtful that the failure to compel AB to undergo an IME will contribute to the erroneous deprivation of respondent-mother's parental rights. The second *Eldridge* factor therefore weighs against the order.

Finally, the third factor—the state's interest—also weighs against ordering respondent-mother's request for an IME. The trial court erroneously concluded that the government interest weighed in favor of examination. The trial court stated that its ruling on termination would affect all seven Bell children, acknowledged the state's interest in the welfare of AB, and conceded that the delay between the most recent alleged assault and the IME meant that the exam might show "minimal to no evidence of any sexual assault." The court nevertheless found that the public interest weighed in favor of ordering the IME.

The government has a range of interests in this case. With respect to fiscal and administrative costs alone, the requested IME places a minimal burden on the state. The government also undeniably has a strong interest in preserving the family unit whenever possible. *Sanders*, 495 Mich at 416. But ordering AB to submit to an IME would do little to further this interest. The IME is unlikely to provide useful findings in favor of the parents, and certainly will not provide a conclusive answer to whether respondent-father sexually assaulted AB and whether respondent-mother was told about this abuse. Therefore, the IME will, at most, marginally impact the government's interest in maintaining family units. The government interest most affected by

---

[11] Not only are any potential findings not dispositive, but there is a reasonable argument that such information is minimally relevant. The lack of physical evidence of sexual assault—particularly when the last possible assault occurred 10 months ago—does not necessarily indicate that AB was not sexually assaulted.

the court-ordered IME is the interest in protecting the physical and mental health and safety of minors like AB. See *Sanders*, 495 Mich at 409-410. Forcing AB to undergo an IME undermines this interest because it may be detrimental to AB's health. And more broadly, allowing trial courts to force sexual assault complainants to undergo medical examinations—particularly when the examination will have minimal probative value—could have the unintended effect of deterring disclosure of sexual assault. See *Arenda*, 416 Mich at 10 (discussing how the limitations on introducing evidence of a complainant's sexual history in CSC cases removes an unnecessary deterrent to the reporting of crime). Accordingly, the final *Eldridge* factor weighs in favor of denying the request for a court-ordered IME.

This Court's duty to balance the State's interest in protecting the health and safety of minor children against the fundamental rights of parents to care for their children can be a difficult task. In this case, however, the trial court's due-process analysis was severely lacking in its explanation. Under the circumstances presented here, the *Eldridge* factors all weigh in favor of AB—and in favor of denying an unwanted IME. Balancing the highly invasive nature of an IME and its potentially harmful effect on an unconsenting minor against the limited evidentiary value that an IME may provide in this case, the trial court erred by concluding that a court-ordered IME to look for evidence of sexual assault was necessary to afford respondent-mother the due process to which she was entitled.

Reversed and remanded for proceedings not inconsistent with this opinion. We do not retain jurisdiction.

/s/ Deborah A. Servitto
/s/ Michael F. Gadola
/s/ James Robert Redford

-8-