*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BROWN/WHITE, Minors.

UNPUBLISHED
June 16, 2022

No. 359038
Wayne Circuit Court
Family Division
LC No. 2020-000699-NA

Before: RONAYNE KRAUSE, P.J., and M. J. KELLY and YATES, JJ.

PER CURIAM.

This case arises following the death of respondent's three-month old child, DB. Respondent appeals as of right the trial court's order terminating her parental rights to her surviving children, DDB, MLB, MAB, and MW, under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j) and (k)(*iii*).[1] We conclude that the trial court clearly erred by finding statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), and (k)(*iii*). However, the trial court did not clearly err by finding statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(j) or by finding that termination of respondent's parental rights was in the best interests of her surviving children.[2] Because only one statutory ground for termination need be established, *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011), we affirm.

---

[1] The trial court's order terminating respondent's parental rights states that the court found statutory grounds to terminate under MCL 712A.19b(3)(k)(*ii*), not (k)(*iii*). Nevertheless, based upon our review of the petition to terminate respondent's parental rights and the presentation of evidence at the preliminary hearing and the termination hearing, it is apparent that the court found grounds to terminate under subdivision (k)(*iii*) and that its reference to subdivision (k)(*ii*) was a scrivener's error.

[2] The trial court also terminated the parental rights of DB's father to DDB, MLB, and MAD. He has not appealed that decision. MW's father was a non-respondent parent.

# I. BASIC FACTS

DB died on March 28, 2020. Prior to her death, DB's only caretakers were her father and respondent. Specifically, on March 27, 2020, respondent was home with her children, including DB, for most of the day. No other adults came to her home that day. From around 8:00 or 9:00 p.m. on March 27 until approximately 3:30 a.m. on March 28, respondent left DB and DB's siblings in the care of their father.

DB's father admitted to a caseworker that he had been drinking prior to watching the children. He told the caseworker that he put DB to sleep in her "pack-and-play" at approximately 10:00 p.m., and that he then slept on the couch. Around 11:00 p.m., he woke up and held DB on the couch for a time and then put her in the adult bed before he returned to sleeping on the couch. He was awakened by DB crying at approximately 4:30 a.m., but he did not attend to her because respondent was already with her. Similarly, respondent reported to the caseworker that she cared for DB at approximately 4:30 a.m. on March 28. She provided care for DB in the adult bedroom, changing her diaper and feeding her. At the time, DB was crying and inconsolable.

The caseworker testified that DB's father told her that he woke up again at 8:00 a.m. and went to the adult bedroom to lay down. Eventually, he touched DB to make room for another child in the bed, and he discovered that DB was limp and unresponsive. He told the caseworker that he took DB into the living room and alerted respondent to the situation. Respondent and DB's father attempted CPR and called 9-1-1. Neither respondent nor DB's father informed the caseworker of any incidents or falls that DB might have suffered, nor did they offer any explanation as to how DB may have been injured. Because the medical examiner's report indicated that the cause of death was blunt force trauma to DB's head and that the manner of death was homicide, petitioner filed a petition seeking jurisdiction over the surviving children and termination of the parental rights of DB's father and respondent.

At the termination hearing, Dr. Omar Rayes was qualified as an expert in forensic and anatomic and clinical pathology. Dr. Rayes conducted a postmortem examination of DB one day after her death. He testified that he did not observe any external injuries to DB. However, during the internal portion of the examination, he observed an area of subdural hemorrhage and subdural blood over the bilateral cerebral hemisphere, which is the dorsal surface of the brain. He opined that DB's injuries could only have been caused by blunt force trauma to the head because, although a subdural hemorrhage can be a result of blunt force trauma to the head or meningitis, there was no evidence of meningitis. Dr. Rayes determined that, because the blood underneath the dura was liquid and not clotted, the blunt force trauma to the head occurred "acutely hours" before DB's death.

Dr. Rayes's opinion was further supported by his observation of a hemorrhage in the optic nerve sheath of the eyes, which he explained was also indicative of blunt force trauma to the head. He testified that the hemorrhage in the optic nerve sheath was sustained within hours of death as the bleeding was fresh. Dr. Rayes also observed a hemorrhage in the bilateral retinas in the inner layer of DB's eyes. He testified that that hemorrhage was sustained in the same timeframe as the other injuries and was significant because it also indicated blunt force trauma to the head. Another injury noted by Dr. Rayes was subarachnoid hemorrhages, which occur when blood seeps into the subarachnoid space—a protective layer of the brain located underneath the dura. This injury can

also be caused by blunt force trauma and was noted to be acutely sustained by DB at the time of her death. Dr. Rayes observed subdural blood over the distal portion of the spinal cord which also correlated to the subdural hemorrhage in the head.

Dr. Rayes stated that the amount of force necessary to cause these injuries was "not a force that you sustain from a fall." He continued that the injuries indicated that this was an inflicted trauma to DB's head. Dr. Rayes's final opinion regarding DB's cause of death was blunt force trauma to the head, though he could not determine if there was more than one blunt force to the head. He opined that the manner of death was homicide, explaining that he had excluded accident as the manner of death because the extent of DB's injuries was consistent with an inflicted trauma rather than a short fall. Specifically, he opined that the degree of force was greater than one a baby would experience by falling approximately 3 feet. Instead, he posited that a child could sustain these types of injuries due to a 10- to 12-foot fall. In addition, he stated that it was not possible for a four-year-old child to cause these injuries to DB. As to the lack of external injuries, Dr. Rayes testified that it was not concerning because baby skin is elastic, which could explain why one would not observe external injuries despite there being internal injuries.

At trial, respondent testified that, based on Dr. Rayes's testimony, she doubted his opinion as to the cause of death, but she did not know whether DB actually died from blunt force trauma to the head. Nevertheless, she stated that she "disputed" his opinion that the manner of death was homicide. It appears that the basis for her dispute was her belief that DB's father did not cause any type of injury to DB. In turn, DB's father testified that he did not believe respondent caused any type of injury to DB. Respondent testified that she intended to keep "planning," with DB's father, which she described as "raising our kids together and being in a relationship" with DB's father. She did state that, if she learned that DB's father has something to do with DB's injury, she would not stay with him or allow him to be around her children. With respect to the events of March 27 until DB's death, at the advice of her lawyer, respondent invoked her Fifth Amendment right against self-incrimination. Finally, respondent testified that DB was born full term, did not have any underlying medical issues, and appeared to be healthy. Prior to March 27, 2019, she did not have to take DB to the doctor or the emergency room for any issues.

Following the combined adjudication trial and termination hearing, the trial court found statutory grounds to take jurisdiction over the children under MCL 712A.2(b)(1) and (2), found statutory grounds to terminate the parental rights of DB's father and respondent under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j), and (k)(*iii*). Thereafter, following a best-interests hearing, the trial court found that termination of the parental rights of DB's father (as to three of the children) and respondent (as to all the surviving children) was in the children's best interests, and it entered an order terminating their parental rights. This appeal by respondent follows.

## II. STATUTORY GROUNDS

### A. STANDARD OF REVIEW

Respondent argues that the trial court erred by finding statutory grounds to terminate her parental rights. A trial court's finding that there are statutory grounds to terminate a respondent-parent's parental rights is reviewed for clear error. *In re A Atchley minor*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 358502); slip op at 5. "A finding is clearly erroneous if,

although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *Id*. at ___; slip op at 3 (quotation marks and citation omitted).

## B. ANALYSIS

The trial court terminated respondent's parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j) and (k)(*iii*). We address each in turn.

### 1. MCL 712A.19b(3)(b)

Termination is warranted under MCL 712A.19b(3)(b) if the court finds by clear and convincing evidence:

> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

> (*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

This Court has held that termination of parental rights under subdivision (b)(*i*) and (b)(*ii*) "is permissible even in the absence of definitive evidence regarding the identity of the perpetrator when the evidence does show that the respondent or respondents must have either caused or failed to prevent the child's injuries." *In re Ellis*, 294 Mich App at 35-36. In *Ellis*, the respondents lived together in a small apartment and were the only individuals who provided care for their child. *Id*. at 35. Testimony at trial indicated that the child "suffered numerous nonaccidental injuries" that were "highly indicative of child abuse, using a very high force of impact, and inconsistent with any sort of accident." *Id*. The injuries "were in various stages of healing," which allowed for an inference that the child "had suffered multiple instances of abuse over a prolonged time." *Id*. A physician testified that, because of the injuries, the child would have "shown signs of distress at least periodically." *Id*. Respondents were unable to "offer any plausible alternative explanation" for the child's injuries. Based on that evidence, this Court concluded "that the trial court properly determined that at least one of [the respondents] has perpetrated the abuse and at least one of them had failed to prevent it; consequently, it did not matter which did which." *Id*.

This case bears many similarities to *Ellis*. DB's father and respondent lived together and were DB's sole caretakers. Testimony at trial indicated that DB died after sustaining blunt force trauma to her head. The manner of death was determined to be homicide, and nonaccidental injury was ruled out. Although respondent testified that she disputed Dr. Rayes's determination that the manner of death was homicide, she offered no alternative explanation for DB's injuries—plausible or otherwise. Instead, she testified that she did not believe DB's father caused the injuries. She invoked her Fifth Amendment right against self-incrimination when asked questions regarding the

events of March 27 and March 28, which allowed for an adverse inference to be drawn against her. See *In re Martin, minor*, 316 Mich App 73, 86 n 9; 896 NW2d 452 (2016) (holding that "invoking the Fifth Amendment in an abuse and neglect proceeding, as opposed to a criminal proceeding, gives rise to an adverse inference against the respondent in the proceeding") (quotation marks, citation, and alteration omitted); see also *In re MU, minor*, 264 Mich App 270, 283 n 5; 690 NW2d 495 (2004) (accord).[3] Similarly, DB's father testified that he did not believe respondent caused the injuries, and he invoked his right against self-incrimination when asked questions regarding the events of March 27 and March 28. Taken together, the evidence clearly allows for an inference that either DB's father or respondent physically abused DB.

However, the difference between this case and *Ellis* is the lack of clear and convincing evidence supporting a finding that the non-abuser parent failed to prevent the abuse. In *Ellis*, it was significant that the child had numerous nonaccidental injuries in various stages of healing and that there was testimony that the child would have shown signs of distress because of his injuries. *Id*. at 35. Those facts allowed for an inference that the abuse would have been apparent to the non-abuser parent, given that it occurred on more than one occasion and over an extended period of time. In contrast, in this case, the medical testimony indicates that the injury was caused in the 24-hour period before DB's death. No external injuries were visible. Therefore, although DB had severe internal injuries, there is nothing on this record to suggest that the non-abuser parent would have been able to detect them. The record is also devoid of any evidence suggesting that DB—or any of her siblings—had sustained any prior injuries indicative of child abuse. Thus, there is nothing to suggest that the non-abuser parent was aware of the need to protect the child from the abuser. On this record, therefore, although the evidence overwhelmingly allows for an inference that either DB's father or respondent perpetrated the abuse, there is not clear and convincing evidence that the non-abuser parent failed to prevent that abuse. Consequently, the trial court clearly erred by terminating respondent's parental rights under MCL 712A.19b(3)(b)(*ii*).

And, because it cannot be established by clear and convincing evidence that *respondent* was, in fact, the parent that abused DB, the trial court also clearly erred by terminating respondent's parental rights under MCL 712A.19b(3)(b)(*i*). The court's finding of grounds to terminate must be supported by clear and convincing evidence. *In re Pederson, minors*, 331 Mich App 445, 473; 951 NW2d 704 (2020). "Evidence is clear and convincing if it 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear

---

[3] We are bound by *MU* and *Martin*. MCR 7.215(C)(2). *Martin* relied on *MU*, which in turn cited to *Phillips v Deihm*, 213 Mich App 389; 541 NW2d 566 (1995). That case was purely a civil matter. Because termination proceedings are considered "quasi-criminal" proceedings, we believe that *Martin* and *MU* may have been wrongly decided. After all, unlike a civil case, a termination of parental rights case involves the State taking away a parent's child or children. We do not, however, have occasion to address the issue because respondent has not argued on appeal that the trial court erred by drawing an adverse inference based on her invocation of the Fifth Amendment. Regardless, even without the adverse inference permissible under *Martin* and *MU*, the record in this case supports the trial court's finding that either DB's father or respondent perpetrated the abuse on DB.

conviction, without hesitancy, of the truth of the precise facts in issue.' " *Id*., quoting *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995). Here, because the evidence only shows that it is equally likely that DB's father or respondent was the perpetrator of the abuse, the evidence presented falls short of the clear and convincing standard.

### 2. MCL 712A.19b(3)(g)

Termination under MCL 712A.19b(3)(g) is proper if the trial court finds by clear and convincing evidence:

> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

In order to terminate a respondent-parent's parental rights under MCL 712A.19b(3)(g), the trial court must, therefore, find by clear and convincing evidence that the respondent-parent is "financially able" to provide proper care and custody for his or her children. At the termination hearing, the caseworker testified that respondent was not working, but respondent testified that she was employed. The trial court did not make any findings as to whether respondent was employed or unemployed. Moreover, there is nothing in the record to support a finding that, even if respondent were employed, she was financially able to provide proper care and custody for her children. Indeed, the trial court made no actual finding that respondent was, in fact, able to provide proper care and custody for her children. As a result, we conclude that the court clearly erred by finding that termination was appropriate under MCL 712A.19b(3)(g). The legislature's decision to require a finding that a parent is financially able to provide proper care and custody before termination under subdivision (g) is not optional.

### 3. MCL 712A.19b(3)(j)

The trial court also found statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(j). Termination is appropriate under subdivision (j) if the court finds by clear and convincing evidence that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent."

As explained above, the unrefuted medical testimony shows that DB died from blunt force trauma to the head that was inflicted in the 24-hour period before her death. Accidental injury was ruled out, and neither DB's father nor respondent has offered a plausible (or implausible) alternative explanation for the injury. DB's father and respondent were the only caretakers for DB in the relevant timeframe. Thus, as explained above, the trial court did not clearly err by finding that either DB's father or respondent was the perpetrator of the abuse.

If respondent was the perpetrator of the abuse, her conduct (killing DB) shows that there is a reasonable likelihood her surviving children will be harmed if returned to her care. If she is not the perpetrator, then, even when presented with unrefuted evidence that DB died from blunt force trauma inflicted by DB's father, the record reflects that she nevertheless intends to continue

-6-

her relationship with him and raise her children with him.[4] Under those circumstances, her conduct (planning to continue her relationship with and raise her children with the man who killed DB) shows that there is a reasonable likelihood that her surviving children will be harmed if returned to her care. Accordingly, on this record, the trial court did not clearly err by finding statutory grounds to terminate respondent's parental rights under MCL 712A.19b(j).

### 4. MCL 712A.19b(3)(k)

Finally, the trial court terminated respondent's parental rights under MCL 712A.19b(3)(k)(*iii*), which provides that termination is proper if the court finds by clear and convincing evidence:

> (k) The parent abused the child or a sibling of the child, the abuse included 1 or more of the following, and there is a reasonable likelihood that the child will be harmed if returned to the care of the parent:
>
> \* \* \*
>
> (iii) Battering, torture, or other severe physical abuse.

Here, although there is evidence that DB suffered severe physical abuse leading to her death, there is not clear and convincing evidence that respondent was the one who abused her. Instead, as explained above, the evidence only allows for an inference that either DB's father or respondent was the perpetrator of the abuse. Because subdivision (k)(*iii*) requires the court to find that the parent abused the child, and because such a finding is not supported by clear and convincing evidence on this record, we conclude that the trial court erred by finding this statutory ground for termination.

### III. BEST INTERESTS

### A. STANDARD OF REVIEW

Respondent also argues that the trial court erred by finding that it was in her surviving children's best interests to terminate her parental rights. This Court reviews "for clear error the trial court's determination regarding the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).

---

[4] Respondent testified that if she learned that DB's father had hurt DB, she would leave him. However, her assertion is contradicted by the record, which reflects that DB's manner of death was a homicide and that she died from nonaccidental blunt-force trauma to the head. Further, as indicated by respondent's statements to her caseworker, respondent was aware that she and DB's father were the only individuals providing care for DB in the 24-hour period before her death. Here, given its termination decision, it is apparent that the court did not find respondent's testimony that she would leave DB's father to be credible.

## B. ANALYSIS

"The trial court should weigh all the evidence available to determine the children's best interests." *Id*. "To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id*. (quotation marks and citation omitted). "[T]he trial court has a duty to decide the best interests of each child individually." *In re Olive/Metts Minors*, 297 Mich App 35, 42; 823 NW2d 144 (2012) (citation omitted). However, the trial court does not err if it fails to make explicit findings regarding best interests as to each child where the factual findings would be redundant. *In re White*, 303 Mich App at 716. "[A] child's placement with relatives weighs against termination." *In re Olive/Metts Minors*, 297 Mich App at 43 (quotation marks and citation omitted).

In this case, respondent's clinic evaluation revealed that DDB, MAB, and MLB did not appear frightened of her and were excited to see her. Additionally, no grossly inappropriate interactions were observed; instead, respondent spoke to the children in a loving manner and shared loving interactions with them. The children reciprocated that emotional investment. Yet, despite the strong bond between respondent and the children, and despite the fact that the children had been placed with relatives, the trial court did not clearly err by finding termination of respondent's parental rights was in the children's best interests. Indeed, the record clearly shows that DB died either as a result of abuse perpetrated by her father or by respondent. Respondent intended to continue her relationship with and raising her children with DB's father. Her decision to invoke her right against self-incrimination allowed for the court to draw an adverse inference against her. In light of those facts, the trial court did not clearly err by recognizing that the safety of the children would be jeopardized if returned to respondent's care—either because she was the perpetrator of the abuse or because she intended to continue raising her children with the perpetrator of the abuse. In addition, there was evidence of an incident of domestic violence between DB's father and respondent. Specifically, a caseworker testified that one child observed DB's father and respondent argue, which resulted in DB's father pushing respondent, who was then injured. Respondent minimized this encounter at the termination hearing, stating only that they had argued and she had lost her balance. Finally, the record shows that the children were doing well in their placements. Overall, on this record, the trial court did not err by finding termination of respondent's parental rights was in the best interests of her surviving children.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Michael J. Kelly
/s/ Christopher P. Yates